## 37255. GILREATH v. THE STATE.

HILL, Presiding Justice.

This is a death penalty case. Fred Marion Gilreath, Jr., appeals his convictions and sentences to death for the murders of his wife and his father-in-law.

On May 11, 1979, Dempsey Wolfenbarger went to the Mableton Precinct of the Cobb County Police where he spoke with Corporal J. E. Davis. Wolfenbarger told Davis he was concerned about the safety of his stepdaughter, Linda Gilreath. He explained that Linda was in the process of obtaining a divorce from her husband, Fred Marion Gilreath, Jr., and that several days previously she had left their home to stay with her mother (Wolfenbarger's wife). Earlier on the 11th she had returned with her father to the Gilreath home, indicating that she would pick her stepfather up at work at 3:30 p.m. When Linda had not returned, her mother asked a friend, Shirley Harrell, to pick Wolfenbarger up at work. Once he arrived home, his wife (Linda's mother) called Linda's attorney for advice. He suggested that the Wolfenbargers go over to the house; Dempsey Wolfenbarger decided instead to go to the police station. He told Corporal Davis that he feared there might be "domestic trouble", and that Fred Gilreath had threatened Linda's life as well as the lives of the Wolfenbargers, and had threatened to burn the Wolfenbargers' trailer. Wolfenbarger also told Davis his tires had been slashed and he believed Gilreath had done it. Finally, he said that Linda was driving a blue Plymouth Duster and Gilreath drove a red truck.[1]

Cpl. Davis radioed for a back-up unit; Officer Roy Rogers responded and the two police officers arrived at the Gilreath residence at approximately 5:00 p.m. The blue Duster was not in sight. Cpl. Davis knocked on the front door; no one answered. Rogers knocked at the side door to a screened-in porch; no one answered.

---

[1] When Dempsey Wolfenbarger solicited the aid of the police he was acting for the most part on information supplied by his wife. She testified that she had told her husband that Linda's father, Gerrit Van Leeuwen, had come to her home, where Linda was staying, about 12:30 p.m. on May 11th. He came in the blue Duster to get Linda to come home to talk to her husband and pick up her personal belongings. Linda and her father left for the Gilreath residence in the blue Duster at about 1:30 p.m. It takes about ten minutes driving time to reach the Gilreath home from the Wolfenbarger home. Linda said she'd be back in time to pick Dempsey Wolfenbarger up at work at 3:30 p.m. About 2:30 p.m., Mrs. Wolfenbarger began phoning the Gilreath home but got no answer. Mrs. Wolfenbarger asked a friend, Shirley Harrell, to pick Dempsey up at work. Mrs. Harrell passed the Gilreath residence coming and going; she told the Wolfenbargers that she saw Fred Gilreath's red truck and Gerrit Van Leeuwen's gold Volkswagen in the driveway, but she did not see the blue Duster.

Davis then peered into the enclosed garage looking for the Duster. He rejoined Rogers by the side screened porch and they observed that both the porch door and the sliding glass door inside the porch were ajar, that the sound of music could be heard, and that a strong odor of gasoline permeated the area. The two officers then entered the screened porch (which Davis described as looking like an enclosed carport) and looked through the sliding glass door. From that vantage point, Rogers saw a man's body. He then stepped inside the glass door and saw Linda's body. Rogers told Davis he had found a second body and Davis entered, too. The two officers could see large puddles of gasoline in the kitchen and toward the living room; they also saw a shotgun and a shell lying on the floor. They then checked the other rooms of the house looking for the Gilreaths' two children.[2] Finding no one, the officers called the detectives, secured the crime scene (they disturbed nothing except that they opened the front door to disperse the gas fumes) and went outside to await the detectives. Wolfenbarger arrived shortly after Davis and Rogers discovered the bodies but was not allowed to enter the house.

Detective Julian Deal arrived at about 5:33 p.m. He walked through the house, interviewed Dempsey Wolfenbarger, and then reentered the house to complete his investigation, i.e., locate evidence, take measurements and make drawings.[3] Deal testified that upon checking he discerned no signs of forcible entry into the house. He found a green army-type gas can sitting by the door to the screened porch. He entered through the sliding glass doors and found Linda Gilreath's body lying between a coffee table and a love seat in the living room; a pink towel covered her face and a white medium-sized suitcase sat by the end table. The evidence showed that Linda had been shot five times along her right side with a .30-30 lever action rifle from approximately two to three feet away. She had been shot in the face from approximately five to six feet away with a .12 gauge shotgun. Matter from her face was splattered across the love seat, carpet and walls.

Gerrit Van Leeuwen was lying a short distance away; he had sustained a .30-30 wound to his right thigh, a shotgun wound to his left chest, and two .22 caliber wounds to his head. Gasoline had been poured on and around the victims as well as on the kitchen floor.

---

[2] Mr. Wolfenbarger had told Cpl. Davis the Gilreaths had two children. The officers were not aware that Linda Gilreath and Shirley Harrell had taken the children to Seneca, South Carolina, the day before to stay with Linda's sister.

[3] Deal was assisted by Detective Tressell. At least two other officers were at the scene.

Sgt. Deal seized numerous items which were in plain view, among them a .22 caliber short shell casing, six .30-30 caliber shell casings, two shotgun shell casings, a .22 caliber rifle and a .12 gauge shotgun. Two days later he returned with a search warrant and recovered another .22 caliber shell casing.

Prior to diagramming the crime scene, Sgt. Deal had placed a southeastern regional lookout on Fred Gilreath and on the blue Duster. Upon receiving the message, the dispatcher for the sheriff's department in Hendersonville, North Carolina, contacted Mike Gilreath who lived and worked in Hendersonville, told him about the message, and asked him to let the sheriff's department know if he saw or heard from his brother Fred. Fred Gilreath arrived at his brother's office, driving the blue Duster, at approximately 7:30 p.m. Mike Gilreath immediately asked one of his business associates to go tell the sheriff that his brother had arrived. The business associate, being new in town, went first to the police station from whence he was directed to the sheriff's office. Three officers arrived at Mike Gilreath's office at 8:00 or 8:05 p.m. By then Fred Gilreath had showered with his clothes on and was wearing only his still wet cut-off shorts.[4] The officers arrested him, explaining that he was wanted for questioning in relation to a double homicide in Georgia; Gilreath asked if he could call his wife.

Sgt. Deal arrived in Hendersonville the next day. Pursuant to a warrant he searched the Duster that afternoon and again on May 14th. In the latter search a partial box of .22 caliber short ammunition was recovered. While in North Carolina, Sgt. Deal travelled to a cabin, purportedly belonging to Fred Gilreath, located in a mountainous area. Deal testified that he went to get a description of the property in order to procure a search warrant. Upon reaching the area, Deal walked down an old road to the cabin. While standing out front, he picked up several shotgun shell cases, .30-30 caliber cartridge cases, and .22 caliber cartridge cases which were lying in the drive. Three shotgun shell cases and eleven .30-30 caliber Browning shell cases which Deal retrieved at this time were later introduced into evidence.

The shotgun and the .22 caliber rifle which were found at the scene were identified as the murder weapons by a firearms examiner from the State Crime Laboratory. The firearms examiner also

---

[4] A forensic serologist from the State Crime Laboratory testified that she examined these shorts and found a stain which could have been blood. Because the sample was inadequate, it could not be positively identified.

established that the .30-30 caliber shells which were fired at the victims were fired by the same firearm which had fired the .30-30 shells found in the drive of the cabin in North Carolina.

The Gilreaths' next door neighbor testified that he heard muffled gunshots coming from the direction of the Gilreaths' home between 1:30 p.m. and 2:40 p.m. on May 11.[5] He paid little attention to them because it was not uncommon to hear gunshots in the neighborhood. This neighbor also reported having seen water in the street. When police contacted the Cobb County Water Department they found three workmen who had bled a water hydrant directly across the street from the Gilreath residence on May 11th. The workmen had arrived at approximately 1:30 p.m. and left at approximately 1:50 p.m. One workman testified he heard five rapid-fire shots from what sounded like a high-powered rifle emanate from the Gilreath residence. He also testified that he was busy doing paperwork and didn't see anyone. Another of the workmen testified that he saw a Volkswagen and a van or truck in back of the garage at the Gilreath residence when he arrived. After he arrived, he noticed that a blue car, probably a Dodge, had driven up and parked in the driveway. Because he was getting something from the truck, he did not see the blue car arrive. After the blue car arrived, he saw an old man walk around the house, come back, and go back around the house. He then heard the five shots and did not see the old man again. Shortly thereafter the water crew left; the blue car was still there. The third workman testified that he saw a dark blue over light blue Duster drive up and saw two people get out. One of the two (the passenger) was an elderly man. He saw the elderly man walking around the yard; about a minute after the elderly man disappeared behind the house, he heard the five shots. The worker was unable to say whether the driver of the blue Duster was a man or a woman. He did testify that at the time he heard the shots there were four cars at the Gilreath residence: the blue Duster, a gold Volkswagen, an old red pickup truck, and another old car on blocks.[6] From the foregoing, the jury was authorized to find that the murders occurred between 1:30 (or 1:40) and 1:50 and that the blue Duster was at the scene when the shots were fired.

Fred Gilreath testified in his own defense. He stated that he was

---

[5] The neighbor was able to fix the time because he arrived at home about 1:30 and his stepson came home from school at 2:30 or 2:40. He knew the shots occurred in the interim.

[6] Officer Davis had testified that, when he arrived at the Gilreath residence on May 11th, in addition to the gold Volkswagen and the red pickup, there was a green or off-green Duster on blocks in the driveway.

home on May 11th with his father-in-law. His father-in-law left about 11:30 to go to his ex-wife's home. He was downstairs in his father-in-law's apartment when he heard his wife and her father come in. He heard his wife in the bedroom; he went upstairs and started out the door, telling his father-in-law he'd be back in a few minutes. His father-in-law said "Linda's here and she wants to talk to you" but Gilreath responded, "Gary, I told you I am not ready to talk to Linda. I don't want to talk to her until I get back from North Carolina." He then left in the blue Duster at 1:25 p.m., intending to go to the liquor store and come back. He had had two drinks of rum while alone at the house. At the liquor store he bought a beer and a fifth of vodka. He mixed the two and while drinking decided to go on to Hendersonville. Before proceeding to North Carolina, he went by Statewide Beverages looking for a friend who owed him money. He did not find that man but did speak with another acquaintance, David Bridges. According to the defendant, when he spoke with Bridges he was not drunk, but he was "intoxicated" and things were "a little bit fuzzy."[7] He was wearing cut-off shorts, a tee shirt, a terry cloth hat and sandals. He continued drinking and was sick as he crossed a bridge connecting South and North Carolina. When he reached Hendersonville, he tried to rent a motel room but the clerk refused to give him a room because he was drunk so he went on to his brother's office. When he told his brother he needed to go take a shower to sober up, his brother told him there was a shower in the office. He took off his sandals and hat and put them on an end of the tub because there was nowhere else to put them; his shorts he hung on the one hook available. When he finished showering he discovered his brother had no towels so he put his shorts back on although he was wet, thus accounting for his clothes being wet.

Gilreath identified the .22 caliber rifle and the shotgun as his, as well as the gas can which he said he used for the lawn mower. He denied having killed his wife or his father-in-law.

The jury found Gilreath guilty of both murders and sentenced him to death for each. This is his appeal.

1. Defendant made a pretrial motion to suppress evidence seized from his home on May 11, 1979, and on May 14, 1979. He argued in his motion that Officers Davis and Rogers had no probable cause to enter the curtilage of his home on May 11, and thus

---

[7] David Bridges was called as a witness by the state. When asked if the defendant appeared to have been drinking before arriving at the liquor store, he responded "I really couldn't tell you." He then explained that he had previously been with the defendant when he was drinking and he couldn't notice any difference in him when he had a drink or two, adding that he appeared to hold his liquor well.

everything subsequently seized was subject to suppression. He further argued that the probable cause supporting the warrant pursuant to which the house was searched on May 14 was tainted by the allegedly illegal search which had occurred on May 11. The trial court overruled the motion. On appeal, the defendant reiterates his argument that because the officers made a warrantless entry into the yard or curtilage of his home, all evidence seized as a result of that entry must be suppressed. Citing the Fourth Amendment to the United States Constitution, Code Ann. § 1-804, the Georgia Constitution, Art. I, Sec. I, Par. X (Code Ann. § 2-110), Code Ann. § 27-303, and *Clare v. State,* 135 Ga. App. 281 (217 SE2d 638) (1975), he argues that *no warrantless entry may ever be made into the curtilage of a residence or the residence itself absent consent of the owners or residents of the property.*

We deal here with two separate entries: the entry within the curtilage to knock at the front and side doors, and the entry onto the side porch itself. Defendant argues that notwithstanding Wolfenbarger's request for aid, the police were powerless to set foot on his property absent a warrant or consent by an owner or a resident of the home. We disagree. The fourth amendment proscribes unreasonable searches and seizures. When police respond to requests to locate missing persons by entering private property only to the extent of knocking on outer doors, the fourth amendment has not been violated. We recognize, of course, that "the Fourth Amendment extends beyond the paradigmatic entry into a private dwelling by a law enforcement officer in search of the fruits or instrumentalities of crime." Michigan v. Tyler, 436 U. S. 499, 504 (98 SC 1942, 56 LE2d 486) (1978). But it does not extend so far as to prevent the police from making any contact with the citizenry—and to hold that the police may not, upon request, although exigent circumstances do not appear, approach the outer doors of a dwelling absent a warrant or consent of an owner or occupant would work that result.

Although defendant relies on a number of Georgia cases, none in fact support his premise. In *Clare v. State,* supra, a police officer answered a complaint of a loud disturbance and upon arrival was told by a woman visiting her mother in a first floor apartment that the occupants of a second floor apartment had played a stereo loudly for nearly an hour. The officer proceeded to knock at the outside door to the upstairs apartment; when it was opened, without asking permission he walked up the steps and into the defendant's living room. The objectionable intrusion occurred when he entered the apartment, not when he knocked at the door. Likewise in *Brewer v. State,* 129 Ga. App. 118 (199 SE2d 109) (1973), police answering a complaint about loudness walked up outside steps to a second story

apartment and directly into a room without stopping to knock. The issue the Court of Appeals addressed was whether "the sheriff and his deputy [were] entitled to open the screen door and cross over the threshold into the room without knocking, without identifying themselves, and without asking permission to enter?" Id., 129 Ga. App. at 119. In both *Lewis v. State,* 126 Ga. App. 123 (190 SE2d 123) (1972), and *Black v. State,* 119 Ga. App. 855 (168 SE2d 916) (1969), the officers entered the curtilage of homes without warrants in order to investigate property within the curtilage but outside the homes to determine whether it was stolen. None of these cases offer any support to the defendant here. To the contrary, in our view both *Clare v. State,* supra, and *Brewer v. State,* supra, proceed from an underlying premise that the officer's approach to the outside door, even though it be within the curtilage, is unobjectionable. Of course this is not to say, as *Black v. State,* supra, and *Lewis v. State,* supra, clarify, that a search of the curtilage in investigation of a crime is unobjectionable.

In Mincey v. Arizona, 437 U. S. 385, 392-393 (98 SC 2408, 57 LE2d 290) (1978), the Supreme Court said: "We do not question the right of the police to respond to emergency situations. Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid. Similarly, when the police come upon the scene of a homicide they may make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises. . . And the police may seize any evidence that is in plain view during the course of their legitimate emergency activities." In Ellison v. United States, 206 F2d 476 (D.C. Cir. 1953), police officers investigating the robbery of a drug store went to the defendant's home because he had committed a similar robbery previously. They walked up onto the front porch and rang the doorbell; while waiting for an answer, and again while waiting for the defendant's mother (who answered the door) to ascertain whether he was at home, the officers saw several bottles of the type found in the prescription department of drug stores and some cigarettes lying around. The defendant contended that the officers' entry onto his premises was a trespass and their viewing of the bottles and cigarettes was an illegal search. The court responded: "The officers were perfectly entitled to go to appellant's door, ring the bell, and inquire as to his whereabouts. They were not trespassers in so doing." Id., 206 F2d at 478. More recently, the Eighth Circuit approved a warrantless police entry into a residence where the police were responding to a call for assistance because the occupant was drunk, United States v. Nord, 586 F2d 1288 (8th Cir.

1978), and the Fourth Circuit, when confronted with a police officer's search of a house trailer for a child when he was informed by radio that a young girl had been pronounced dead upon arrival at a hospital and no one knew where her sister was, found no fourth amendment violation. Sallie v. North Carolina, 587 F2d 636 (4th Cir. 1978), cert. denied, 441 U. S. 911 (1979).

We find that none of defendant's fourth amendment rights have been violated. Dempsey Wolfenbarger asked the police to go to the defendant's home because he feared for the safety of his stepdaughter. In responding to his request, the police were authorized to enter the curtilage of the home and knock on the outer doors. It is unnecessary to decide whether the door to the side porch was the threshold to the home or whether the police could legitimately proceed through the porch to the sliding glass doors because in this case that entry was preceded by an awareness of exigent circumstances—the police had become aware of a heavy odor of gasoline emanating from a residence they had some reason to believe was occupied because they could hear music playing although the occupants had not answered the door. Gasoline being readily combustible, the police were authorized to proceed onto the side porch to fulfill their responsibility of ensuring public safety. Once they reached the sliding glass door one of the officers saw Van Leeuwen's body. This further exigent circumstance authorized him to enter the house immediately in search of Linda Gilreath and any other people in the house.

The state's contention that all of the evidence seized as a result of this warrantless entry was in plain view has not been challenged by the defendant. He does not contend that once the officers entered the house the evidence was not subject to seizure under the plain view doctrine; he contends the entry was illegal and that the plain view doctrine could never come into play. We disagree, and hold that under the facts of this case Officers Davis and Rogers were authorized to enter the porch and the house itself, and Detectives Deal and Tressell were authorized to join them there and seize evidence in plain view. Mincey v. Arizona, supra. Furthermore, even assuming that once Officers Davis and Rogers had determined the victims were dead and no one else was in the house Detective Deal could not enter the premises and seize evidence in plain view absent a warrant (an assumption with which we disagree), in this case exigent circumstances for Deal's entry did exist. Because of the quantity of gasoline that had been poured inside the house, the fire department had been called and according to Deal arrived about five minutes after he did. See Michigan v. Tyler, 436 U. S. 499, 509-510, supra. Thus it was necessary for the police to record the scene immediately

lest a fire or the necessary activity of the firemen disturb it.[8] In sum, we find that the trial court properly overruled the defendant's motion to suppress the evidence seized from his home on May 11, 1979.

2. The defendant also complains of the introduction into evidence of the spent shell casings seized by Detective Deal from the drive in front of defendant's cabin in North Carolina. He concedes he filed no written motion to suppress as required by Code Ann. § 27-313 (b) but argues he has not waived his objection because the reason he filed no written motion was that he did not realize the shells had been seized without a warrant until Detective Deal so testified at trial and it was then too late.[9] The record shows, however, that defense counsel was permitted to inspect the physical evidence prior to trial. Thus, the defense knew that the shell casings had been seized; what the defense claims was not known was that the seizure was made without a warrant. Deal identified the exhibits without objection on February 28 and they were not admitted into evidence until February 29. We find that by failing to comply with Code Ann. § 27-313 (b), the defendant waived any objection to the admission of the shells. *Yeldell v. State,* 240 Ga. 37 (2) (239 SE2d 364) (1977).

Defendant also complains of the introduction of the evidence seized outside the cabin in North Carolina on the ground that the state violated the dictates of Brady v. Maryland, 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963); Giles v. Maryland, 386 U. S. 66 (87 SC 793, 17 LE2d 737) (1967); and Giglio v. United States, 405 U. S. 150 (92 SC 763, 31 LE2d 104) (1972), by not responding to his motion to compel discovery of all exculpatory material and information with a statement that the evidence had been seized without a warrant. In our view, neither Brady nor its progeny contemplates such a disclosure. The Court in Brady stated it applied to "evidence favorable to an accused . . . where the evidence is material either to guilt or to punishment. . . ." Brady v. Maryland, supra, 373 U. S. at 87.

---

[8] Although we have discussed the entry and activity of Detective Deal and those police officers who arrived after Davis and Rogers had preliminarily secured the scene, we note defendant's sole objection was to the entry by Davis and Rogers.

[9] The evidence relating to their seizure is the following testimony by Detective Deal: "This was purported to be Mr. Gilreath's cabin. I went to it for the purposes of obtaining a description of the property so I could get a search warrant for it. On walking to it, we observed it and were standing out. There was an old road that went down to it and we had to walk down it to get to the cabin. We got there. We were standing out front. The front door was open and there were several different shotgun and .30-30 caliber cartridge cases lying out in the road area there, and there was also some .22 caliber cartridge cases laying out there." Detective Deal then identified the exhibits as having been "recovered from that driveway" and "collected in that drive out front."

As has been noted frequently, suppression of evidence is contrary to the truthseeking process. See Stone v. Powell, 428 U. S. 465, 490 (96 SC 3037, 49 LE2d 1067) (1976). We hold that the absence of a warrant is not "material either to guilt or punishment" within the the purview of Brady. Thus this enumeration is without merit.

3. Gilreath contends that the trial court's failure to give an oath to the prospective jurors prior to the voir dire as provided by Code Ann. § 59-704.1 (Ga. Laws 1979, p. 1048) mandates reversal. Code Ann. § 59-704.1 provides: "Each panel, prior to commencing voir dire, shall take the following oath: 'You shall give true answers to all questions as may be asked by the court or its authority, including all questions asked by parties or their attorneys, concerning your qualifications as jurors in the case of ——————— (herein state the case). So help you God.' This oath shall be administered by the trial judge." Defendant raised this issue for the first time in his motion for new trial. The matter having been called to its attention, the state obtained the affidavit of Judge Luther Hames of the Cobb County Superior Court, in which he stated "that as part of my duties on February 25, 1980, I gave the jurors for that week the following oaths: 'You shall well and truly try each cause submitted to you during the present term, and a true verdict give, according to the law as given you in charge, and the opinion you entertain of the evidence produced to you, to the best of your skill and knowledge, without favor or affection to either party, provided you are not discharged from the consideration of the case submitted, and you do further swear that you shall give true answers to all questions as may be asked by the parties or their attorneys, concerning your qualifications as jurors. So help you God." This case was tried before Senior Judge John W. Williford from February 25-29, 1980.

The oath given by Judge Hames tracks Code Ann. § 59-706, which provides an oath for petit juries in civil cases. However Judge Hames added at the end of the oath prescribed by Code Ann. § 59-706 language similar to that contained in Code Ann. § 59-704.1; that is, he swore the jurors to give true answers during voir dire. Defendant makes much of the absence of the name of his case and the fact that the oath was not given by the trial judge. These differences do not require reversal. See *Slaughter v. State,* 100 Ga. 323, 326 (28 SE 159) (1897). The record shows that the jury was in fact sworn to give true answers on voir dire, and that the oath was administered by a judge. *Ates v. State,* 155 Ga. App. 97 (2) (270 SE2d 455) (1980), relied on by the defendant, is inapposite because there the voir dire oath was administered by the district attorney. In *Gober v. State,* 247 Ga. 652 (2) (278 SE2d 386) (1981), we held that where the Code Ann. § 59-706 oath was administered but the oath required by Code Ann. § 59-704.1

was not administered, reversal was not required where no objection had been made.

Defendant also complains that the voir dire oath was given outside his presence. He argues that he has a right to be present during every stage of the trial and that he did not waive that right as to the voir dire oath. As defendant asserts, "It is the legal right of a person accused of crime in this State to be present at all stages of his trial. . . ." *Wilson v. State,* 212 Ga. 73, 74 (90 SE2d 557) (1955). Defendant cites numerous cases wherein the defendant's absence required reversal, but all involve either the jury viewing evidence outside the courthouse, *Chance v. State,* 156 Ga. 428 (1) (119 SE 303) (1923); rereading evidence, *Wade v. State,* 12 Ga. 25 (1852); argument of counsel, *Wilson v. State,* supra, 212 Ga. 73; recharging the jury, *Wilson v. State,* 87 Ga. 583 (13 SE 566) (1891); *Bonner v. State,* 67 Ga. 510 (1881); *Martin v. State,* 51 Ga. 567 (1874); a colloquy between the jury and the trial judge, *Seay v. State,* 111 Ga. App. 22 (3) (140 SE2d 283) (1965); receiving a verdict, *Lyons v. State,* 7 Ga. App. 50 (66 SE 149) (1909); or ordering a mistrial when the jury was unable to reach a verdict, *Bagwell v. State,* 129 Ga. 170 (1) (58 SE 650) (1907). None involve the administration of an oath to the jury.[10] We find that the voir dire oath prescribed by Code Ann. § 59-704.1 is not a "stage of the trial," within the meaning of *Wilson v. State,* supra, and is not a critical stage of the proceedings, such as would require reversal based on the defendant's absence where no motion to have the oath administered to the prospective jurors was timely made.

4. Defendant also complains because the district attorney administered the oath to those jurors who were selected to try the case although the statute provides that "The judge or clerk of the court shall administer the oath to the jurors." Code Ann. § 59-709, as amended, Ga. L. 1978, p. 910. The record shows, however, that the defendant, who was present when the district attorney administered this oath, failed to object. Thus his reliance on *Ates v. State,* supra, 155 Ga. App. 97 (2), is misplaced, because there the district attorney administered the oath over defendant's objection. See also *Tyson v. State,* 157 Ga. App. 569 (278 SE2d 8) (1981). Here no objection was made and hence no reversible error occurred. *Altman v. State,* 156 Ga. App. 185 (10) (273 SE2d 923) (1980). "A party can not during the trial

---

[10] The only case we have found involving the defendant's presence while an oath was administered is *Gray v. State,* 229 Ga. 808 (194 SE2d 479) (1972). The oath involved there was that given to the jury selected to try the case, and the issue of defendant's right to be present was not reached because he was brought in mid-oath whereupon the trial court interrupted the proceedings and had the jury sworn in the defendant's presence.

ignore what he thinks to be an injustice, take his chance on a favorable verdict, and complain later." *Joyner v. State,* 208 Ga. 435 (2) (67 SE2d 221) (1951).

5. During voir dire, the defendant's attorney asked a potential juror whether he believed "that in the case of the death penalty that some one would intervene and stop the execution?" The juror answered, "That is always possible." Defendant's attorney then asked, "How would that affect you in your decision about whether the life or the death penalty would be given?" The juror answered, "It wouldn't." The state's objection to the latter question as calling for a conclusion was sustained. Defendant's attorney then asked, "Let me ask you this, Mr. Roper. If you, assuming hypothetically that a man got the death penalty, do you believe it is really just a life imprisonment rather than the death penalty, or do you believe that that person is going to be executed?" The court sustained the state's objection and instructed the jurors as follows: "Well, I'll charge you this, Ladies and Gentlemen. I will charge all you jurors that in the event that you find the Defendant guilty of Count One, Count Two, or both, you would assume that whatever penalty you issued would be carried out. Does everybody understand that?" At that point the transcript states that the prospective jurors nodded their heads affirmatively.

Appellant contends that the court's ruling violated his due process rights and prevented him from making a meaningful examination of the jurors, as contemplated by Code Ann. § 59-705. He points out that no executions have occurred in Georgia in some 16 years, and he theorizes that some jurors might assess the death penalty more casually than otherwise because they think it will not be carried out.[11] In support of his contention he points to the response of a prior juror who when asked "[O]n this death penalty business, you don't doubt for a second that if this Jury found my client guilty and gave him the death sentence, that he would be executed, do you?" responded, "I know that there has been a long time since any have been executed, so it seems that is still kind of up in the air. I don't know if that answers your question or not." This juror, however, when next asked, "You don't feel like if he got the death penalty that he might just sit down there and really have a life imprisonment?", responded, "No, Sir."

We find no error in the trial court's ruling in view of the court's instruction to the jury that they assume whatever punishment they

---

[11] This is an updated version of the "Private Slovik syndrome" argument. See *Ross v. State,* 238 Ga. 445 (233 SE2d 381) (1977).

826

imposed would be carried out. The questions proposed by the defendant are not contemplated by Code Ann. § 59-705 and the trial court did not abuse its discretion in disallowing them. See *Smith v. State,* 238 Ga. 146 (5) (231 SE2d 757) (1977). Nor did the trial court's ruling deprive defendant of due process. We note, in this connection, that while a prosecutor's argument, over objection, that the jury should impose the death penalty and assume it will be set aside if not warranted, absent curative instructions, would require reversal, see *Fleming v. State,* 240 Ga. 142, 146 (240 SE2d 37) (1977), the defendant may argue to the jury that they should weigh the decision on punishment heavily since if they impose the death penalty the state will exact it.[12]

6. In addition to his complaint that the state did not disclose Detective Deal's visit to his North Carolina cabin, Division 2, supra, the defendant contends that his motion to compel disclosure of all exculpatory material and information was not complied with in several other respects. First he complains that although he specifically asked for all statements made by the defendant as well as for all information which would in any way weaken or tend to weaken the state's case against the defendant, two statements that he had made were not disclosed by the trial court following its in camera inspection, and thus the trial court erred in overruling his motion for mistrial made when the statements were introduced.[13] The statements he refers to were that when told by a Detective Harris with the Henderson County Sheriff's Department that warrants had been issued in Cobb County for his arrest for the murder of his wife and father-in-law, he responded by saying that couldn't be and asking if he could call his wife; and that when Detective Deal asked in his first encounter with the defendant if he knew what he had been charged with, the defendant responded "Some homicide," and when Deal said "You are charged with the murders of your wife and father-in-law," the defendant said "I was afraid it was that because she didn't call" and "I have got to go back to my cell." When the state sought to introduce these statements, the defendant objected on the

---

[12] The defendant did argue to the jury: "The buck stops right here, Ladies and Gentlemen. The only person who can sentence this man is you. It stops right on this bar. If that situation occurred that I just described to you [another person later confessing], it wouldn't be [the prosecutor's] fault that the wrong man went to the electric chair. He would say 'Oh, the Jury did that,' because you are the only ones who can do it." (In this connection, see division 18 which indicates that some jurors were crying when they returned the death penalty verdict.)

[13] This case was tried before the effective date of Ga. L. 1980, p. 1388; Code Ann. § 27-1302, providing for production of defendant's statements.

ground that they had not been produced. The court overruled the objections. On appeal, the defendant complains because the statements were not disclosed to him until the witnesses testified and because his motions for mistrial were overruled. Brady v. Maryland, supra, Division 2, applies to exculpatory material unknown to the defendant. United States v. Agurs, 427 U. S. 97, 103 (96 SC 2392, 49 LE2d 342) (1976). Statements made by the defendant are not unknown to him and hence are not discoverable under Brady. *Baker v. State,* 245 Ga. 657 (3) (266 SE2d 477) (1980). Moreover, the record shows that at the conclusion of the first day of trial, the trial court informed the defendant that he had completed his in camera inspection of the state's file and orally disclosed the two statements at issue. Detective Harris testified on the second day of trial and Detective Deal testified on the third day.[14] Brady requires that exculpatory evidence not be withheld from the defendant at trial; this requirement was met here. *Chafin v. State,* 246 Ga. 709 (6) (273 SE2d 147) (1980). Thus the defendant's enumerations of error are without merit.

7. In his motion to compel disclosure of all exculpatory material and information, the defendant also sought disclosure of any evidence or statements which might be used to impeach the credibility of any of the state's witnesses. On appeal, he complains that he was not given a copy of Jerry Roddy's pretrial statement to the police until after the state had rested its case. Jerry Roddy was one of the Cobb County Water Department employees who was working across the street from the Gilreath residence on the afternoon in question. Defendant contends that his testimony at trial differed materially from this statement and that the state must have been aware of the discrepancies no later than immediately prior to the trial when he was reinterviewed by a detective and the assistant district attorney who worked with the district attorney in trying the case. Once the witness had concluded his testimony on direct examination, the defendant renewed his motion to obtain a copy of his statement. The motion was overruled and the defendant proceeded to cross examine Roddy. Subsequently, after the state had rested, the trial court provided a copy of Roddy's statement to the defendant and the defendant recalled Roddy and cross examined him with reference to the statement. The cross examination revealed inconsistencies between his statement and his testimony which will

---

[14] The first day of trial was February 26, 1979. February 25 was consumed by voir dire and other pretrial matters.

be discussed infra, division 14.

Defendant contends that the failure of the district attorney to disclose the statement as soon as it became evident that it was impeaching violated the dictates of Brady v. Maryland, supra, 373 U. S. 83, and Giles v. Maryland, supra, 386 U. S. 66. We cannot agree. Defendant concedes that Roddy's statement did not become impeaching until he contradicted it in his testimony, although he speculates that the state became aware of potential contradictions shortly before trial. But the critical fact in our view is that Roddy's statement was provided to him during the trial and he was allowed to recall Roddy and cross examine him with reference to it. See *Chafin v. State,* supra. A prior contradictory statement of a witness does not become contradictory or exculpatory until the witness testifies.

Defendant argues that exculpatory materials must be furnished at an appropriate time. See Williams v. Dutton, 400 F2d 797 (5th Cir. 1968), cert. denied, 393 U. S. 1105 (1969). He argues that exculpatory materials must be furnished before trial when the material is such that it cannot be effectively used if disclosure is withheld until trial. See United States v. Thevis, 84 FRD 47 (N. D. Ga. 1979). A statement of a witness which does no more than show that the witness made a prior contradictory statement has its most effective use at trial, in cross examination. We find no violation of Brady and no harm to the defendant.[15]

8. Defendant enumerates as error the trial court's overruling of his notice to produce served upon the district attorney. Relying on Code Ann. § 38-801, the defendant sought to obtain statements of those witnesses who testified for the state after they had testified.[16] He points out that federal law requires such disclosure after the witness has testified, 18 USCA § 3500, and that pretrial disclosure of witnesses' names and statements is recommended by the ABA Standards, Discovery and Procedures Before Trial § 2.1 (a) (1970). Georgia law is to the contrary, however. " '[S]tatements of witnesses in the prosecutor's files (nothing more appearing) may not be reached by Code Ann. § 38-801(g).' " *Holton v. State,* 243 Ga. 312 (2) (253 SE2d 736) (1979), cert. denied 444 U. S. 925 (1979), quoting *Stevens v.*

---

[15] After the defendant filed his motion to compel disclosure of exculpatory material, the trial court conducted an in camera inspection of the district attorney's file and then sealed and transmitted copies of the material inspected to this court. We have reviewed that material and determined that no exculpatory material was withheld from the defendant.

[16] Jerry Roddy's statement, which is discussed in division 7, supra, was of course included within the terms of this request.

*State,* 242 Ga. 34 (1) (247 SE2d 838) (1978). And 18 USCA § 3500 is neither constitutionally required nor applicable to state trials. United States v. Augenblick, 393 U. S. 348, 356 (89 SC 528, 21 LE2d 537) (1969); Calley v. Callaway, 519 F2d 184 (5th Cir. 1975), cert. denied 425 U. S. 911 (1976). The trial court did not err in overruling the notice to produce.

9. Defendant complains that five of the state's exhibits were admitted over his complaint that the chain of custody was not established. The five are: (1) Exhibit 30, a blue work shirt which was removed from the body of Gerrit Van Leeuwen; (2) exhibit 35, a pill box containing two .22 caliber lead bullets; (3) exhibit 43, a pill box containing one .30 caliber metal jacketed bullet and one lead core; (4) exhibit 44, a small pill box containing several mutilated buckshot and some wadding; (5) exhibit 45, a small plastic vial with four buckshot. The first four exhibits were identified by Dr. Joseph Burton, the Cobb County Medical Examiner who performed autopsies on the victims' bodies, as having been removed from the victims' bodies, packaged, labeled and sent by him to the State Crime Laboratory. Kelly Fite, a firearms examiner at the State Crime Laboratory, testified that he received them. Contrary to defendant's assertion, this testimony adequately establishes the chain of custody of these exhibits. *Murphy v. State,* 238 Ga. 725 (3) (234 SE2d 911) (1977). As for the fifth item, exhibit 45, we have neither been directed to nor been able to locate any place in his testimony where Dr. Burton identifies it. Kelly Fite did identify exhibit 45 as having been sent to the crime lab by Dr. Burton. Assuming without deciding that the chain of custody of exhibit 45 was not properly established, in view of the fact that several other buckshot were retrieved and identified, the introduction of exhibit 45 was not reversible error.

10. Defendant complains that the trial court erred in introducing bank records of the Gilreaths' account to show the defendant had made a large withdrawal a few days before the murders over his objection that they were not properly authenticated under Code Ann. § 38-711. A review of the record shows that copies of the bank's microfilms of the Gilreaths' account were identified by Richard Fisher, Assistant Vice President and Custodian of the Records for the National Bank of Cobb County. Mr. Fisher explained the bank's method of making and maintaining these microfilm records. When a witness' testimony shows that records were made in the regular course of business and that it was a regular course of business to make such records within a reasonable time of the act, transaction, occurrence or event, it is unnecessary that the witness use these specific words. *Home Finance Co. v. Smith,* 116 Ga. App. 76 (1) (156 SE2d 522) (1967). The trial court did not err in admitting

these records.

11. Defendant complains that the trial court erred in overruling his objection to color photographs of the victims and their wounds, arguing that they were repetitive and cumulative and that their prejudicial effect outweighed their probative value. Neither in the trial court nor here has the defendant specified which photograph or photographs he contends were repetitive and cumulative of which other photograph. On appeal he does say "There were three separate pictures of the exploded head of one victim." We have examined all the photographs and determined that they were not unduly repetitive. Since they were accurate and correct representations of material fact, their probative value outweighed their prejudicial effect and the trial court did not err in admitting them. *Franklin v. State,* 245 Ga. 141 (3) (263 SE2d 666), cert. denied 447 U. S. 930 (1980).

12. When Grace Wolfenbarger testified, she identified state's exhibit 1 as a photograph of the blue Plymouth Duster that her daughter and ex-husband drove when they left her home. Subsequently the photograph was tendered and admitted into evidence without objection.

When the prosecutor attempted to introduce four other photographs of cars, which in addition to state's exhibit 1 had allegedly comprised a photographic lineup shown to certain witnesses, the defendant objected that no foundation had been laid as it had not been shown that they were shown to any witnesses. The trial court sustained this objection. Later in the trial Jerry Roddy testified that these five photographs had been shown to him, but the latter four were never admitted into evidence.

During his closing argument, the district attorney told the jury that the pictures would go out with them and requested the jury to "take a look at that lineup when you go out." At that point, defendant objected on the basis that four of the pictures had not been admitted. The trial court concurred with the defendant, but when the district attorney recollected that they had been admitted, the trial was recessed briefly while the court reporter checked the record. When it became clear that they had never been admitted, the defendant moved for a mistrial. The trial court overruled the motion and instructed the jurors to disregard the district attorney's comments and the pictures themselves in the event that they had seen them. Defendant now complains that the trial court erred in overruling his motion for mistrial. We cannot agree. The pictures of the four cars used in a photographic array are not prejudicial. Even assuming the defendant was prejudiced by this occurrence, the trial court's instructions were curative and the court did not abuse its discretion

in denying the motion. *Roberts v. State,* 242 Ga. 634 (4) (250 SE2d 482) (1978); *Patterson v. State,* 239 Ga. 409 (2) (238 SE2d 2) (1977).

13. Defendant contends that the trial court erred in refusing to give five charges which he requested. We deal with each singly.

First, the trial court did not err in refusing to charge on intoxication. The defendant requested a charge substantially in the language of Pattern Charge I-32, which reads: "Voluntary intoxication by use of alcohol (drugs or narcotics) is not excuse for crime. The fact that one accused of a crime was under the influence of alcohol (drugs or narcotics) at the time of the alleged crime may be shown as illustrative of his motive in the transaction, but one voluntarily under the influence of alcohol (drugs or narcotics) is presumed to intend the legitimate consequences of his act, and the question is whether he intended to do the act, or whether he intended the consequences of the act. If a person under the influence of alcohol (drugs or narcotics) is sufficiently intelligent to know or understand and intend to do a certain act and to understand that certain consequences are likely to result from it, and does the act, he is criminally liable for the consequences of his act. However, if because of the influence of alcohol (drugs or narcotics), one's mind becomes so impaired as to render him incapable of forming an intent to do the act charged, or to understand that a certain consequence would likely result from it, he would not be criminally responsible for the act. Whether or not that is true is a question for the jury to determine." The trial court charged the last sentence of Code Ann. § 26-704: "Voluntary intoxication shall not be an excuse for any criminal act or omission." The charge as given correctly stated Georgia law. Code Ann. § 26-704; *Choice v. State,* 31 Ga. 424 (7) (1860); *Beck v. State,* 76 Ga. 452 (1) (1886); *Thomas v. State,* 105 Ga. App. 754 (125 SE2d 679) (1962). The case before us, as in so many cases, but unlike the cases cited, involves only intoxication; the case before us does not involve any question of sanity. The pattern charge is misleading to the extent that it implies that voluntary intoxication in and of itself may be a defense to a crime, and the trial court did not err in refusing the requested charge.

The trial court did not err in charging on flight, especially since the court charged the jury that it was up to them "to determine if there was flight" as well as to consider whether an explanation other than consciousness of guilt might explain any flight. *Harris v. State* 234 Ga. 871, 874 (218 SE2d 583) (1975).

Defendant submitted requests to charge on voluntary manslaughter and on irresistible passion and cooling time, and a request that the trial court charge that the state had the burden of proving that the defendant did not act in the heat of passion, that is,

did not commit voluntary manslaughter. The trial court did not err in refusing to charge voluntary manslaughter since there was no evidence of any "sudden, violent and irresistible passion resulting from serious provocation." Code Ann. § 26-1102; *Bowen v. State,* 241 Ga. 492 (2) (246 SE2d 322) (1978). Separation of husband and wife, including the turmoil associated therewith, and the filing of suit for divorce, without more, do not reduce murder to voluntary manslaughter. Likewise the trial court did not err in refusing to charge on irresistible passion and cooling time. If the defendant is contending that in every murder case the state must disprove the elements of voluntary manslaughter, we disagree. *Davis v. State,* 237 Ga. 279 (2) (227 SE2d 249) (1976). If he is contending that where the evidence raises an issue as to voluntary manslaughter, the burden is on the state to disprove that the defendant acted in the heat of passion, that issue is rendered moot by our finding that the evidence did not raise an issue as to voluntary manslaughter.

Finally, the defendant requested a charge that malice cannot be implied by the jury but that the state must produce evidence that shows malice beyond a reasonable doubt. The court charged Code Ann. § 26-1101: "Malice shall be implied where no considerable provocation appears, and where all the circumstances of the killing show an abandoned and malignant heart." We approved this charge in *Franklin v. State,* supra, 245 Ga. 141 (9). The court then charged: "[M]alice as an element of the crime of murder may not generally be implied. Evidence must be presented by the state of a deliberate intention unlawfully to take away the life of a fellow creature, by the Defendant, which is manifested by external circumstances capable of proof or from other evidence introduced by the state which satisfies your mind beyond a reasonable doubt that Defendant acted with malice aforethought." This is the charge defendant requested, except that the trial court added the word "generally." This enumeration of error is without merit.

14. Defendant contends that his conviction must be reversed because the evidence is insufficient to support the verdict. He contends that all of the evidence is consistent with his own testimony as to his innocence except that of Jerry Roddy and Steven Stone, the two employees of the Cobb County Water Department who testified that the blue Duster was at the Gilreath house when the shots were fired, and their testimony was so completely impeached as to be of no probative value. Stone testified on direct examination that he had seen a dark blue over light blue Duster arrive, that 2 people got out, one of whom was an elderly man, and that the Duster was still there when the shots were fired. On cross examination, defendant established that at his first interview, on May 17, 1979, the first

mention of the Duster was when Detective Deal asked: "Do you recall a blue Plymouth Duster, light blue, dark blue top, it was a '72, 1972 blue Plymouth Duster?" Stone responded that all he knew was that it was a light colored car, but if Detective Deal showed him a picture he could tell him whether it was the car he saw. He went on to say that about a week later Detective Deal showed him pictures of six or seven cars and he picked the Duster out. The defendant also established that in this initial statement Stone said, "As far as watching who got out of the car and all, I can't remember as to how many got out of the car or who was in the car, anything like that, but I do remember a car pulling in the driveway." Finally, the defendant established that Stone had signed an affidavit prepared by a private investigator which stated that a man in his late forties or early fifties was already in the yard when the blue car (which he described as either a Duster or a Demon) arrived and that two people got out of the blue car, one of whom was a man about 30 years old. Stone testified that he did not recall ever having said the older man was already in the yard, and that he had made a mistake in not reading the affidavit carefully before he signed it. He admitted that he had said a man about 30 got out of the car, but testified that he really wasn't positive it was a man and it could have been a woman.

Jerry Roddy testified on direct examination that when he was first at the water hydrant the blue Duster was not there, that he went to get a sign to put under the water so it wouldn't tear up the grass and when he came back the blue car, which he described as a Dodge, had arrived, and that at that point he saw an older man in the yard for the first time. On cross examination, defendant established that when Roddy was first interviewed by Detective Deal on May 17, 1979, he stated that: "We was in the truck when we heard the gunshot . . . .", and that when asked what cars he had seen he mentioned the gold Volkswagen, the red truck, and the old green Duster, but he said nothing about a blue car being there or arriving while he was there. On redirect, he testified that at a later date he was shown five pictures of cars and he identified the blue Duster.

Defendant contends that these two witnesses were so thoroughly impeached that their testimony should be disregarded, pursuant to Code Ann. § 38-1806. Code Ann. § 38-1806 provides: "When a witness shall be successfully contradicted as to a material matter, his credit as to other matters shall be for the jury, but if a witness shall swear wilfully and knowingly falsely, his testimony shall be disregarded entirely, unless corroborated by circumstances or other unimpeached evidence. The credit to be given his testimony where impeached for general bad character or for contradictory statements out of court shall be for the jury to determine." This

record does not disclose that the witnesses swore "wilfully and knowingly falsely." The question of credibility of witnesses is for the jury. *Davis v. State,* 242 Ga. 901 (8) (252 SE2d 443) (1979), vacated and remanded on other grounds, 446 U. S. 961 (1980).

The jury was authorized to find that the defendant was having a domestic dispute with his wife, that the victims arrived at the defendant's home in a blue Duster, that the murders occurred between 1:30 and 1:50 p.m., that Linda Gilreath had time to pack some of her belongings after she arrived and before she was killed, that Gerrit Van Leeuwen was outside when the shooting started, that the victims were killed with weapons belonging to the defendant and kept in his home, that the weapons bore no fingerprints, that the house showed no evidence of forced entry, that the perpetrator poured gasoline on the victims and from there to the kitchen where it could have ignited, that the blue Duster was at the house when the shots were fired, that the defendant was driving the blue Duster when he was arrested in North Carolina, that he had taken a shower with his clothes on, and that there was a possibility that he had had blood on his clothes. Defendant contends that he left the house shortly after his wife and her father arrived. He speculates that the murders were committed by someone who arrived after he left. However, there is no evidence that anyone else arrived before the shots were heard.

Reviewing the evidence in the light most favorable to the jury's determination, we find that it was sufficient to enable a rational trier of fact to find the defendant guilty of both murders beyond a reasonable doubt. *Crawford v. State,* 245 Ga. 89 (1) (263 SE2d 131) (1980); Jackson v. Virginia, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). This enumeration of error is without merit.

15. Defendant's remaining enumerations of error relate to the sentencing phase of his trial. He contends that because of three instances of improper argument by the district attorney his sentences to death must be reversed. His first complaint concerns the district attorney's argument: "Whether or not we argue or we think that the defendant may or may never get out of jail is not for us to say, but you as jurors have to look at punishment that meets the crime. It is as simple as that." The defendant moved for a mistrial on the ground that this argument contravened Code Ann. § 27-2206, which provides: "No attorney at law in a criminal case shall argue to or in the presence of the jury that a defendant, if convicted, may not be required to suffer the full penalty imposed by the court or jury, because pardon, parole, or clemency of any nature may be granted by the Governor, State Board of Pardons and Paroles, or other proper authority vested with the right to grant clemency. If counsel for either side in a criminal case should so argue to the jury, opposing

counsel shall have the right to immediately request the court to declare a mistrial; and in which case, it shall be mandatory upon the court to declare a mistrial; and upon failure so to do, same shall constitute reversible error. This section shall be construed as setting forth regulations in addition to those provided for in section 24-3319 and section 81-1009." The trial court overruled the motion for mistrial.

The purpose of the statute is to prevent prosecutors from arguing in essence that the jury should give a more severe sentence to compensate for possible pardon, parole, or other clemency. Upon objection to argument which contravenes this statute, a mistrial is mandatory. Dicta to the contrary in *Spraggins v. State,* 243 Ga. 73 (1) (252 SE2d 620) (1979), vacated and remanded on other grounds, 446 U. S. 961 (1980), is contrary to the statute and will not be followed.

At issue, here, however, is whether the district attorney's comment contravened the statute. The district attorney made no reference to pardon, parole or other clemency. We find that his argument does not contravene the statute. *Redd v. State,* 242 Ga. 876 (4) (252 SE2d 383) (1979); *Mason v. State,* 236 Ga. 46 (7) (222 SE2d 339), cert. denied, 428 U. S. 910 (1976).

Defendant also complains of two other remarks made by the district attorney in his closing argument. He contends that the district attorney went outside the record in arguing: "[E]very day that I sit down on the third floor and I look at four thousand felons come in, there are those cases that deserve a little bit of mercy, and there are those cases where the element of mercy should be involved, but then there are those cases, Ladies and Gentlemen, where mercy is sought after, and you know in your heart and in your mind that from the evidence that mercy will be thrown back in your face"; and in arguing that capital punishment saves lives and is a "form of self defense." Were this not a death penalty case, these enumerations of error would present nothing for review since no objection to these remarks was made. *McAllister v. State,* 231 Ga. 368 (1) (202 SE2d 54) (1973); *Scott v. State,* 229 Ga. 541 (6) (192 SE2d 367) (1972). Because this is a death penalty case, and the allegedly improper argument occurred in the sentencing phase of the trial, we have reviewed these remarks and determined that they were not so inflammatory and prejudicial as to mandate setting aside the death penalty on the basis that it was imposed under the influence of passion, prejudice, or any other arbitrary factor. Code Ann. § 27-2537 (c)(1); *Potts v. State,* 241 Ga. 67 (15) (243 SE2d 510) (1978).

16. Defendant enumerates as error several aspects of the trial court's charge in the sentencing phase of his trial. First, he contends that Godfrey v. Georgia, 446 U. S. 420 (100 SC 1759, 64 LE2d 398)

(1980), holds that a charge which recites the aggravating circumstance established by Code Ann. § 27-2534.1 (b)(7), that the murder was "outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim," without explaining any of these terms, results in "standardless and unchanneled imposition of death sentences in the uncontrolled discretion of a basically uninstructed jury. . . ." Godfrey v. Georgia, supra, 446 U. S. at 429.[17] While we do not read Godfrey as holding that no death sentence imposed on the basis of this aggravating circumstance may stand absent clarifying instructions by the trial court, we find it unnecessary to decide that question here because there was no request for clarifying instructions. Moreover, all of the terms in Code Ann. § 27-2534.1 (b)(7) are words of ordinary significance which require no explication, with the exception of "aggravated battery." "Aggravated battery" is a crime defined by statute. Code Ann. § 26-1305. In this case, the trial court charged the definition of aggravated battery as provided in that Code section.

Defendant enumerates error on the trial judge's failure to charge without request that the aggravated battery must occur before death. See *Hance v. State,* 245 Ga. 856 (3) (268 SE2d 339) (1980). Just as we do not agree that the trial court must, at least absent request, clarify the meaning of Code Ann. § 27-2534.1 (b)(7), we do not agree that the trial court must charge without request that aggravated battery must occur before death. The jury clearly would understand this from the definition of aggravated battery given in charge.

Defendant also enumerates as error the trial court's submission to the jury of the aggravating circumstance established by Code Ann. § 27-2534.1 (b)(2) with reference to the murder of Gerrit Van Leeuwen. That section provides "The offense of murder . . . was committed while the offender was engaged in the commission of another capital felony. . . ." The charge complained of follows: "The murder of Gerritt Willem Van Leeuwen was committed while the offender was engaged in the commission of another capital felony, to wit, the murder of Linda Van Leeuwen Gilreath." Focusing on the words "while . . . engaged in the commission of another capital felony," defendant argues that Code Ann. § 27-2534.1 (b) (2) only applies where the accompanying capital felony is a "continuing

---

[17] We note that in the case before us the trial court's charge of this aggravating circumstance used "and" instead of "or" throughout. On the other hand, in Godfrey, supra, the district attorney stated to the jury that "torture" and "aggravated battery" were not involved and the jury found only that "the offense of murder was outrageously or wantonly vile, horrible and inhuman."

offense," such as armed robbery. He urges that a murder cannot be accomplished while one is "in the commission" of another murder.[18] We find this construction of Code Ann. § 27-2534.1(b)(2) excessively narrow and decline to adopt it. *Strickland v. State,* 247 Ga. 219, 230-31 (275 SE2d 29) (1981); *Peek v. State,* 239 Ga. 422, 431 (238 SE2d 12) (1977), cert. denied, 439 U. S. 882 (1978). This enumeration is without merit, as is the enumeration which asserts that this aggravating circumstance cannot be applied under the evidence here because it is not possible to know which victim was shot first.

17. Defendant's final objection to the charge of the trial court is that the trial court erred in charging as follows: "If there are no aggravating circumstances found to exist unanimously and beyond a reasonable doubt, then fix the sentence punishment at life." Defendant contends this statement would have led the jury to believe it was up to the defendant to disprove the aggravating circumstances before a life sentence would be authorized. We cannot agree. This sentence was excerpted from the last paragraph of the charge, which reads as follows: "Now, go down here to Count Number Two. If you find one or more of the aggravating circumstances do exist unanimously and beyond a reasonable doubt, there again then you would determine whether or not you recommend to the mercy of the Court or recommend life imprisonment or whether you recommend the death penalty. Bear in mind that anything and everything this Court has said, under no circumstances conceivable do you have to render a death penalty recommendation. Y'all understand that, so you go out now, consider whether these aggravating circumstances exist, and if they don't, just fix life imprisonment as to Count One and Two. If they exist as to Count One, if aggravating circumstances exist as to Count One, then you determine whether it will be life imprisonment or a death penalty. Come down to count Two. *If there are no aggravating circumstances found to exist unanimously and beyond a reasonable doubt, then fix the sentence punishment at life.* If you find one or more of these aggravating circumstances under Count Two listed as B and C in the notice of aggravating circumstances, then you would determine whether or not you would recommend them to the mercy of the Court or recommend a life sentence or whether you would recommend the death penalty. Do you

---

[18] In support of this theory, the defendant cites Godfrey v. Georgia, supra, 446 U. S. at 433, n. 15: "Georgia does not, as do some States, make multiple murders an aggravating circumstance, as such." We do not believe that in making that comment the United States Supreme Court was construing Code Ann. § 27-2534.1 (b)(2) as being inapplicable to multiple murders.

understand?" Having reviewed the entire charge and the portion objected to in context, we find no merit in this enumeration of error.

18. Defendant contends that the trial court erred in denying his motion for mistrial as to the sentencing phase of the trial. Defendant moved for mistrial at the time sentence was imposed on Monday, March 3, 1980, the trial having been concluded on Friday, February 29, 1980. In so moving, defendant's counsel stated: "If it please the Court, on Friday evening at approximately midnight when the Jury brought back the death sentence in this case, I observed, and I state in my place at this time that I observed that at least five and possibly six of the women jurors on this jury were sobbing and seemed to be in great emotional distress. The emotional distress continued while the sentence was read by the clerk of this court and even thereafter in the hallways. . . ." The trial court overruled the motion, stating, "at the time of the death sentence, each juror was polled and I didn't notice anything in particular. I noticed that some of them obviously may have been crying, but they certainly were not in the jury box, and that was also true when they came out with a verdict of guilty, so I don't think that we had a situation here at all that was real emotional from the standpoint of anything displayed in the courtroom, and I will overrule your motion."

Even assuming that several jurors were crying as and immediately after the death penalty verdict was announced, this does not show, as defendant asserts, that the death penalty was "imposed under the influence of passion [or] prejudice. . . ." Code Ann. § 27-2537 (c) (1). Such behavior tends rather to show that the jurors appreciated the enormity of their decision. The jury having been polled, the trial court did not err in overruling the motion for mistrial and the alternative motions that the defendant either be sentenced to life or granted a new trial as to sentencing, or that the jurors be reconvened for a hearing to determine whether the death sentences were rendered under the influence of passion.

19. In four enumerations of error, Gilreath contends that, as to each murder, the evidence does not support the jury's finding that the murders were "outrageously or wantonly vile, horrible or inhuman in that [they] involved torture, depravity of mind, or an aggravated battery to the victim." Code Ann. § 27-2534.1 (b) (7). In support of this contention, he relies on Godfrey v. Georgia, 446 U. S. 420, supra. We disagree with his contention that this case is indistinguishable from Godfrey. In Godfrey, each victim was shot only once, except for the shooting the bodies were untouched, and the defendant remained at the scene. Here Linda Gilreath was shot six times; her father was shot four times. According to the medical examiner, a forensic pathologist, although each of Linda's six wounds was fatal, each

would not render her unconscious instantaneously. In fact, as the defendant established on cross examination, depending on which wound was inflicted first, she would have been able to scream after being shot.[19] As for her father, the wound to his leg was not fatal, although it rendered his leg useless; the wound to his chest was fatal, but not necessarily instantaneously; the two wounds to his head were fatal and would have rendered him instantly unconscious. Additionally, gasoline was poured over the bodies and although it was not ignited, since a pilot light was burning in the kitchen the defendant may well have expected it to ignite after he left the scene. Thus the evidence supports the jury's finding of Code Ann. § 27-2534.1 (b) (7) as to each murder. *Hance v. State,* supra, 245 Ga. 856.

20. Defendant contends that because under Code Ann. § 26-3102 the trial court must sentence a defendant to death where the jury finds a statutory aggravating circumstance and recommends death, while where a defendant pleads guilty, the trial court may sentence the defendant to life imprisonment or death, Code Ann. § 26-3102 unconstitutionally burdens his right to a jury trial. He relies on United States v. Jackson, 390 U. S. 570 (88 SC 1209, 20 LE2d 138) (1968). In Jackson, the Supreme Court held unconstitutional a portion of a federal statute because it provided that "In an interstate kidnapping case where the victim has been liberated unharmed, the defendant's assertion of the right to jury trial may cost him his life, for the federal statute authorizes the jury—and only the jury—to return a verdict of death." Id. at 572. The Georgia statute does not create such a dilemma since a defendant may be sentenced to death by a jury, or by a judge upon a plea of guilty. Code Ann. §§ 26-3102, 27-2528. See *Moore v. State,* 233 Ga. 861 (213 SE2d 829) (1975), cert. denied, 428 U. S. 910 (1976); *Fair v. State* 245 Ga. 868 (268 SE2d 316) cert. denied, 101 SC 407 (1980).

The defendant also relies on Justice Blackmun's concurring opinion in Lockett v. Ohio, 438 U. S. 586, 613 (98 SC 2954, 57 LE2d 973) (1978). Justice Blackmun pointed out that in Ohio, upon a plea of guilty or no contest to a charge of aggravated murder, a trial court could dismiss the specifications of aggravating circumstances in the interest of justice, which dismissal precludes imposition of the death

---

[19] The medical examiner theorized, in his reconstruction of the scene, that Linda Gilreath was first shot five times by the .30-30 lever action rifle, with the shots moving up her body; her father then walked in and was shot in the leg by the same weapon. Her father was then shot in the chest by the shotgun, following which Linda Gilreath was shot in the face by the shotgun. Finally, her father was shot twice in the head by the .22 caliber rifle.

penalty. Id. at 618. But where the jury finds an aggravating circumstance, the trial court may impose life imprisonment rather than the death penalty only upon finding one of the statutory mitigating circumstances exists. Id. at 618-19. Lockett is inapposite because in Georgia, whether sentencing be by judge or jury, life imprisonment may be imposed even though statutory aggravating circumstances are found to exist. Code Ann. §§ 26-3102, 27-2528; *Fleming v. State,* 240 Ga. 142 (7), supra. In sum, we find no merit in this enumeration of error. Likewise we find no merit in the enumeration of error contending that the death penalty is cruel and unusual punishment and is thus proscribed by both the United States and the Georgia constitutions. Gregg v. Georgia, 428 U. S. 153 (96 SC 2909, 49 LE2d 859) (1976).

21. As required by Ga. L. 1973, p. 159, et seq., (Code Ann. § 27-2537 (c) (1-3)), we have reviewed the death sentences in this case. We have considered the aggravating circumstances found by the jury and the evidence concerning the crime and the defendant pursuant to the mandate of the statute. We conclude that the sentence of death imposed in this case was not imposed under the influence of passion, prejudice or any arbitrary factor. See Divisions 15 and 18.

The jury found the following aggravating circumstances: (a) the murder of Linda Van Leeuwen Gilreath was outrageously and wantonly vile, horrible and inhuman in that it involved torture, depravity of mind and an aggravated battery to the victim (Code Ann. § 27-2534.1 (b) (7)); (b) the murder of Gerrit Willem Van Leeuwen was outrageously and wantonly vile, horrible and inhuman in that it involved torture and depravity of mind, and aggravated battery to the victim (Code Ann. § 27-2534.1 (b) (7)), and (c) the murder of Gerrit Willem Van Leeuwen was committed while the offender was engaged in the commission of another capital felony, to wit: the murder of Linda Van Leeuwen Gilreath (Code Ann. § 27-2534.1 (b) (2)).

During the guilt-innocence phase of the trial, the jury found the defendant guilty of two counts of murder. The imposition of the death penalty where the evidence as to guilt is circumstantial is not unconstitutional. *Nelson v. State,* 247 Ga. 172 (15) (274 SE2d 317) (1981); see also the cases cited in the concurring opinion in *Nelson.* We find that the evidence factually substantiates and supports the findings of guilt and the aggravating circumstances by a rational trier of fact beyond a reasonable doubt. Jackson v. Virginia, supra; *Hance v. State,* supra. See Divisions 14 and 19, above.

In reviewing the death penalty in this case, we have considered the cases appealed to this court since January 1, 1970, in which a death or life sentence was imposed. Cases selected for comparison

include those involving a death sentence or those involving a life sentence for domestic homicides, that is, where the victim was a girlfriend, spouse or ex-spouse of the perpetrator or a relative of the girlfriend, spouse or ex-spouse. As we noted in *Tyler v. State,* 247 Ga. 119, 126 (274 SE2d 549) (1981), "although lesser sentences than death are frequently imposed in domestic murder cases, it does not follow that the death penalty would not be authorized for the murder of one spouse by another under any circumstances," citing *Dix v. State,* 238 Ga. 209 (232 SE2d 47) (1977). Some of the most vicious homicides have been perpetrated by family members against one another. Since January 1, 1970, juries throughout the state have given the death penalty in six domestic murder cases. See Appendix. Thus, domestic murders are not "a capriciously selected group of offenders" within the proscription of Gregg v. Georgia, supra, 428 U. S. at 199. In two such cases in which the death penalty was returned, as in the instant case, the defendants had no prior record.

The nine multiple murder cases selected for comparison likewise illustrate that the death penalty is imposed in such cases. (Two such cases, *Smith v. State,* 236 Ga. 12 (222 SE2d 308) (1976), and *Strickland v. State,* 247 Ga. 219 (275 SE2d 29) (1981), were also considered as "domestic" cases.)

In sum, we find that the similar domestic and multiple murder cases listed in the Appendix support the affirmance of the death penalty. The defendant's sentence to death for murder is not excessive or disproportionate to the penalty imposed in similar cases considering both the crime and the defendant.

*Judgment affirmed. All the Justices concur.*

DECIDED JUNE 30, 1981
REHEARING DENIED JULY 15, 1981.

*Land, Atkinson & Schane, Tyrus R. Atkinson, Jr.,* for appellant.
*Thomas J. Charron, District Attorney, Debra Halpern Bernes, Assistant District Attorney, Arthur K. Bolton, Attorney General, Nicholas G. Dumich, Assistant Attorney General,* for appellee.

APPENDIX.
*Sirmans v. State,* 229 Ga. 743 (194 SE2d 476) (1972); *Gregg v. State,* 233 Ga. 117 (210 SE2d 659) (1974); *Floyd v. State,* 233 Ga. 280 (210 SE2d 810) (1974); *Chenault v. State,* 234 Ga. 216 (215 SE2d 223) (1975); *Smith v. State,* 236 Ga. 12 (222 SE2d 208) (1976); *Burt v. State,* 236 Ga. 815 (225 SE2d 248) (1976); *Dix v. State,* 238 Ga. 209

(232 SE2d 47) (1977); *Alderman v. State,* 241 Ga. 496 (246 SE2d 642) (1978); *Westbrook v. State,* 242 Ga. 151 (249 SE2d 524) (1978); *Mulligan v. State,* 245 Ga. 266 (264 SE2d 204) (1980); *Addendum -* 245 Ga. 881 (268 SE2d 351) (1980); *Fair v. State,* 245 Ga. 868 (268 SE2d 316) (1980); *Tyler v. State,* 247 Ga. 119 (274 SE2d 549) (1981); *Strickland v. State,* 247 Ga. 219 (275 SE2d 29) (1981).

## CORRECTIONS.

Page 83, line 37: Change "25" to "24."
Page 181, line 12: Change "302" to "1302."
Page 289, line 2: Change "Wills" to "Willis."