## 36671. TYLER v. THE STATE.

MARSHALL, Justice.

This is a death case. The appellant, Shirley Tyler, was convicted of the murder of her husband by a Pike County jury. The jury found one aggravating circumstance and sentenced the appellant to death. The case is before us on direct appeal and for mandatory review of the death sentence.

The evidence presented at trial follows:

The appellant and the victim lived next door to the victim's father, William Tyler. On September 18, 1979, the appellant sent her son to William Tyler's home to inform the victim's parents that the victim was seriously ill. Going next door, William Tyler found his son

---

lying face down on the floor of his bedroom. The victim was wet with perspiration, calling for ice water and requesting that a fan be turned on him. William Tyler testified that his son was foaming at the mouth and attempting to vomit, that he could not control his bowels, and was complaining of a burning abdominal pain. The victim was unable to stand or to otherwise control his muscles, and he had to be carried to the car which transported him to the hospital. There, the victim's condition was diagnosed as a viral infection. He stayed in the hospital for a few days and then returned to work upon release.

On October 3, 1979, the victim's son again informed William Tyler that the victim was ill. Upon investigation, William Tyler discovered the victim lying on the floor, complaining of the same symptoms he had exhibited before. The victim was again admitted to the hospital, where this time his illness was diagnosed as a cerebral hemorrhage. However, neurological tests proved this diagnosis to be inaccurate. After a few days in the hospital, the convulsive seizures which the victim had initially experienced subsided. Headache and high-blood-pressure medications were prescribed, and the victim was released. At trial, the victim's attending physician testified that, within a week of the victim's release from the hospital, he exhibited few of the debilitating symptoms. However, the victim was not well enough to return to work.

On October 22, 1979, in the presence of William Tyler, the victim ate a large bowl of chili, which the appellant had prepared. Approximately an hour later, the victim staggered over to his father's home, exhibiting symptoms identical to those displayed on the two previous occasions. The victim died en route to the hospital.

An autopsy disclosed that the victim died from a fatal ingestion of the chemical parathion. Subsequently, the attending physician inquired of the appellant whether the victim had come in contact with any poison or chemical. The appellant replied that he had not. Upon further inquiry, the appellant stated that the victim's mother had given them some rat poison marketed under the brand name Phoskil. Parathion is the active ingredient in Phoskil.

Expert testimony presented at trial showed that parathion is a toxic pesticide not recommended for use in households. The fatal dose of parathion is approximately half of one teaspoon. The poison can either be ingested or inhaled or it may even enter the body through the skin.

The chemical had been sprinkled around the victim's house as a pesticide. Two of the victim's children were tested and found to have an almost negative amount of parathion in their bodies. Expert testimony illustrated that is is possible, but unlikely, for a human to ingest a fatal does of parathion through the skin.

When initially interviewed by authorities, the appellant stated that the victim probably came in contact with the poison by rolling around on the floor. She admitted in these initial interviews that the victim had eaten shortly before each attack. In a third interview, which occurred in the sheriff's office prior to arrest, the appellant admitted that she had scraped a spoonful of poison out of the cabinet drawer and had mixed it with the chili that the victim had eaten immediately prior to his death. She stated that her motive for killing her husband was to prevent him from hurting her son. Testimony from the appellant's son showed that the victim had hit the child only twice; once "a long time ago" and again on the night of his death. The state also presented evidence that the appellant had been, from time to time, involved with another male, and, in fact, had been out with him on the day of her husband's funeral.

The appellant admitted to investigators that her husband had a life insurance policy, but stated that the value of the policy was only $500. It was later determined by GBI investigators that the actual value of the policy was $15,000.

At trial, the appellant testified that the victim had been despondent and had administered the poison to himself by mixing it in a glass of orange juice. The appellant stated that the victim believed himself to be invincible and was prone to eating glass and other harmful objects to illustrate this belief.

The victim apparently had been in good health prior to this series of illnesses. The state presented testimony by both the victim's doctor and family that the victim appeared normal, had not been dejected, and had been generally in good spirits with the exception of these recurring illnesses.

Other evidence will be examined in more detail in addressing each of the appellant's enumerations of error.

1. The appellant first urges the general grounds. We find that the evidence in this case supports the conclusion that a rational trier of fact could find the appellant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). Therefore, this enumeration is without merit.

2. Next, the appellant argues that she did not freely and voluntarily make the statement in which she confessed to poisoning her husband.

As stated above, the appellant was interviewed on three separate occasions. On the first occasion, the authorities were merely attempting to determine how the victim came in contact with the poison. At this time, the appellant made no incriminating statements. During the second interview, the authorities focused their investigation upon the appellant, and advised her of her

constitutional rights. The appellant made no incriminating statements on this occasion. On the third occasion, the GBI agent investigating the case advised the appellant of her rights; subsequently, the appellant signed a waiver form. At this time, she made a written statement, to wit: "Yes, I did it. He was going to hurt my son, Tony, and I'll not stand for this, because he hurt him once before, and I gave him a little teaspoon in his chili and beans. His mother put it in a drawer and I scraped a little of this out of the drawer." The appellant's attorney objected to the introduction of this statement, arguing that it was inadmissible in that it was the result of a promise of a benefit or a hope of reward. We do not agree.

At trial, the GBI agent testified that, during the third interview, he had advised the appellant as follows: "I told her that the best thing, if she had anything to do with it, was to go ahead and get it off her chest; that sometimes people did things for various reasons; sometimes it's self-defense — just various reasons, and whatever she told me I'd be willing to present it to the court."

Code Ann. § 38-411 states that, for a confession to be admissible, "it must have been made voluntarily, without being induced by another by the hope of benefit or remotest fear of injury." Code Ann. § 38-412 provides that "the fact that a confession shall have been made under a spiritual exhortation or a promise of collateral benefit, shall not exclude it." "Pursuant to Code Ann. § 38-412 a confession made on promise of 'collateral benefit' is not inadmissible. We find that a hope of lighter punishment . . . is usually the 'hope of benefit' to which Code Ann. § 38-411 refers . . ." *Presnell v. State,* 241 Ga. 49, 55 (243 SE2d 496) (1978), reversed on other grounds in 439 U. S. 14 (99 SC 235, 58 LE2d 207) (1978). For an officer to advise an accused that it is always best to tell the truth will not, without more, render a subsequent confession inadmissible under Code Ann. § 38-411. *Watkins v. State,* 199 Ga. 81 (33 SE2d 325) (1945). The statement of the officer was not on its face an inducement or hope of lighter punishment. Therefore, this argument is without merit. See *Presnell v. State,* supra.

The appellant also urges that her statement was involuntary, because the GBI agent threatened to cut off any insurance payments being made to her under the victim's insurance policy if she did not make a statement. The appellant raises this objection to the admission of her statement for the first time on appeal.

At the time the state sought to introduce the appellant's confession in evidence, the trial court conducted a Jackson v. Denno hearing to determine the voluntariness of the statement. At this hearing, the GBI agent testified that he had not threatened or

coerced the appellant on any of the three occasions he had questioned her; that the appellant had come willingly to the sheriff's office to talk to him on the day she made the statement in question; that the appellant refused to talk about the first two illnesses of the victim, but had admitted that she put the pesticide in the victim's food on the night of his death and had given a written statement to that effect. The state also introduced testimony that, at the time the appellant made the statement, she was not under the influence of any type of alcohol or drugs, that she had waived the presence of an attorney, and that she had signed a waiver-of-rights form. The appellant did not testify at the Jackson v. Denno hearing, nor did she object to the admission of her confession on the ground that the GBI agent had threatened her. The trial court concluded that the appellant had voluntarily chosen to make the confession, and admitted it in evidence.

After the prosecution rested, the appellant took the stand in her own behalf. On cross-examination, she alleged, for the first time, that the GBI agent had threatened to cut off payment from the victim's insurance policy in order to exact a statement from her.

On re-direct examination the appellant's counsel did not elicit further information from the appellant concerning the alleged threat, nor did he ask the trial court to re-evaluate its determination that the confession had been voluntarily made in light of this new information.

At one point the trial court cautioned the appellant's counsel not to focus his re-direct examination on questions he had already asked the appellant on direct, but suggested to counsel that if there was "anything new" that the state had "brought out . . . you might want to redirect on [that]." The appellant's counsel responded that he had no further questions of the appellant.

At the close of all the evidence, the trial court charged the jury that they must make an independent determination that the confession was voluntary before they considered it.

The state is required only to prove by a preponderance of the evidence that the appellant's statement was voluntarily made. Lego v. Twomey, 404 U. S. 477 (92 SC 619, 30 LE2d 618) (1971); *Pierce v. State,* 235 Ga. 237 (219 SE2d 158) (1975). The state met that burden in this case. We must accept the trial court's determination that the appellant's statement was voluntarily made absent a showing that this determination was clearly erroneous. See Lego v. Twomey, supra; *Hance v. State,* 245 Ga. 856 (268 SE2d 339) (1980); *Pierce v. State,* supra. A careful review of the record reveals that the decision of the trial judge in favor of admissibility was neither clearly erroneous nor an abuse of discretion.

3. The trial court charged the jury as to two aggravating circumstances: (1) that the offender committed the offense of murder for herself or another for the purpose of receiving money or other things of monetary value. Code Ann. § 27-2534.1 (b)(4), and (2) that the offense of murder was outrageously and wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or an aggravated battery to the victim. Code Ann. § 27-2534.1 (b) (7). The jury returned with a written finding of the aggravating circumstance of "inhuman torture."

The appellant contends that the jury finding was incomplete under Code Ann. § 27-2534.1 (b) (7) and that such a finding could be so broadly construed as to allow the death penalty to be imposed at random in murder cases where it is not intended to be imposed.

"The phrases 'outrageously or wantonly vile, horrible or inhuman' are words of common understanding, have essentially the same meaning, and are included in the statute to distinguish ordinary murders for which the penalty of death is not appropriate, from those murders for which the death penalty may be imposed." *Hance v. State,* supra, at 861. See also Godfrey v. Georgia, 446 U. S. 420 (100 SC 1759, 64 LE2d 398) (1980).

This court has recently held that Code Ann. § 27-2534.1 (b) (7) "consists of two major components, the second of which has three sub-parts, as follows: (I) The offense of murder was outrageously or wantonly vile, horrible or inhuman (II) in that it involved (A) aggravated batter [sic] to the victim, (B) torture to the victim, or (C) depravity of mind of the defendant." *Hance,* supra, at 860. As we held in *Fair v. State,* 245 Ga. 868 (268 SE2d 316) (1980), Code Ann. § 27-2534.1 (b) (7) is worded in the disjunctive rather than the conjunctive. It is not required that the trier of fact find the existence of each disjunctive phrase of the statute. It must be shown simply that the evidence is "sufficient to satisfy the first major component of the statutory aggravating circumstance and at least one sub-part of the second component, as hereinafter set forth." *Hance,* supra, at 861.

In this case, the jury returned a verdict which, although not containing all of the explanatory language of Code Ann. § 27-2534.1 (b) (7), was sufficient to satisfy each major component of statutory aggravating circumstance seven, to wit: "inhuman" (component I) and "torture" (component IIB). Therefore, the jury's verdict constituted a complete finding of the specific and necessary elements of the statutory aggravating circumstance in question.

Where the aggravating circumstance is both specific and authorized by the evidence in a case, it does not permit the "random imposition" of the death penalty. See *Hance v. State,* supra.

Review of the actual application of the statutory aggravating circumstance to the evidence in the case is a matter which will be taken up in the sentence-review division of this opinion.

*Sentence Review.*

As mandated by the statute, Ga. L. 1973, pp. 159, 165 (Code Ann. § 27-2537), we have reviewed the transcript and record in this case as we have in all prior cases under this statute. We find that the sentence of death was not imposed under the influence of passion, prejudice or any other arbitrary factor.

As noted above, the jury found as the aggravating circumstance, "inhuman torture." Code Ann. § 27-2534.1 (b)(7).

Under the evidence in this case, the jury could believe that the victim was poisoned by the appellant on three separate occasions. On each occasion, the victim exhibited symptoms of a painful, burning abdomen, dizziness, weakness, sweating, vomiting and diarrhea. On one occasion, he went into convulsions and had to be placed upon a respirator. In each of the first two instances, the victim fully recovered before being poisoned again. The appellant was present and witnessed the agony that her husband suffered on each of these three occasions. The initial two incidents of poisoning constituted serious physical abuse prior to the final and fatal poisoning. Torture occurs when the victim is subjected to serious physical abuse prior to death. *Hance v. State,* supra, at 861. The jury was authorized to find that acts of the appellant resulted in torture of the victim.

The murder was "inhuman" and, in that regard, this murder is distinguishable from "ordinary" murders in which the death penalty is not appropriate. The victim was not killed instantaneously, but was subjected to serious physical abuse over a one-month period. While the appellant stated that her motive for killing her husband was fear that he would hurt her son, as he had beaten him in the past, the child testified that his father had hit him only twice. There was no evidence to show that the victim was in any manner subjecting the appellant to emotional trauma at the time of the poisonings nor was he in any manner threatening to hurt the appellant or her child. The appellant, furthermore, showed no remorse for the killing, and attempted to conceal the crime. While this is a domestic case, "[t]he statute does not forbid imposition of the death penalty upon marital murderers; it merely requires that [a] statutory aggravating [circumstance] exist[s]." *Dix v. State,* 238 Ga. 209, 216 (232 SE2d 47) (1977).

This case is distinguishable from the recent United States Supreme Court case of Godfrey v. Georgia, supra. In Godfrey, the victims were killed instantaneously, and had been subjecting the perpetrator to emotional trauma prior to the killing. In the instant

case, the evidence shows a pattern of intentional poisonings to the extent that, in each instance, the victim was rendered totally incapacitated and was caused to suffer agonizing pain. Each time the victim recovered, he was poisoned again. The state introduced evidence tending to establish a motive of either the appellant's extra-marital affairs (she saw the alleged lover on the day of the funeral), or expected monetary gain from proceeds of an insurance policy on the victim's life.

We conclude that the evidence supports the finding of the aggravating circumstance and the sentence of death. It meets the standards required by Jackson v. Virginia, supra. We have reviewed the instructions of the trial court during the sentencing phase of the trial, and find that the charge was not subject to the defects dealt with in *Fleming v. State,* 240 Ga. 142 (240 SE2d 37) (1978) and *Hawes v. State,* 240 Ga. 327 (240 SE2d 833) (1978). In reviewing the death penalty in this case, we have considered the cases appealed to this court since January 1, 1970, in which a death or life sentence was imposed. Although lesser sentences than death are frequently imposed in domestic murder cases, it does not follow that the death penalty would not be authorized for the murder of one spouse by another under any circumstances. *Dix v. State,* supra, at 216. Some of the more vile, horrible or inhuman homicides have been perpetrated by family members against one another. We find that the similar domestic murder cases listed in the appendix support the affirmance of the death penalty. The appellant's sentence to death for murder is not excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

*Judgment affirmed. All the Justices concur, except Gregory, J., not participating.*

DECIDED FEBRUARY 11, 1981.

*Bishoff & Hearn, Richard H. Bishoff,* for appellant.

*Ben J. Miller, District Attorney, Johnnie L. Caldwell, Jr., District Attorney, Paschal A. English, Jr., J. David Fowler, Assistant District Attorneys, Arthur K. Bolton, Attorney General, William B. Hill, Jr., Assistant Attorney General,* for appellee.

APPENDIX.

*Jackson v. State,* 229 Ga. 191 (190 SE2d 530) (1972); *Sirmans v. State,* 229 Ga. 743 (194 SE2d 476) (1972); *Morgan v. State,* 231 Ga. 280 (201 SE2d 468) (1973); *Smith v. State,* 236 Ga. 12 (222 SE2d 308) (1976); *Dix v. State,* 238 Ga. 209 (232 SE2d 47) (1977); *Alderman v.*

*State,* 241 Ga. 496 (246 SE2d 642) (1978).