Shirley **TYLER**, Petitioner-Appellee, Cross-Appellant,

v.

Ralph **KEMP**, Warden, Respondent-Appellant, Cross-Appellee.

No. 84–8213.

United States Court of Appeals, Eleventh Circuit.

Feb. 22, 1985.

William B. Hill, Jr., Asst. Atty. Gen., Atlanta, Ga., for respondent-appellant, cross-appellee.

Glenn Zell, Atlanta, Ga., for petitioner-appellee, cross-appellant.

Before GODBOLD, Chief Judge, CLARK, Circuit Judge, and THOMAS *, District Judge.

PER CURIAM:

Petitioner, Shirley Tyler, a state prisoner currently incarcerated at the Middle Georgia Correctional Institute in Hardwick, Georgia, was convicted and sentenced to death for the murder of her husband, James Tyler. After exhausting her state remedies she filed a federal petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 raising ten grounds for relief. The matter was initially referred by the district court to a magistrate. The magistrate recommended that the writ be denied. The district court, however, found that the petitioner had been denied effective assistance of counsel during the penalty phase of the trial. Additionally, the district court found that an instruction given by the state trial court was defective in its explanation of mitigating circumstances. Therefore, the district court granted the

* Honorable Daniel H. Thomas, U.S. District Judge for the Southern District of Alabama, sitting by designation.

writ of habeas corpus as it pertained to the death sentence and the state brings this appeal. We affirm.

*The Death of James Tyler and Petitioner's State Trial*

James Tyler died on October 22, 1979 en route to the hospital. The doctor was unable to ascertain the cause of death and an autopsy was conducted. The pathologist concluded that Mr. Tyler died as a result of poisoning, after finding a lethal amount of parathion in his body. A subsequent investigation revealed a poison called phoskil (containing parathion) had been spread around the Tyler home to kill roaches. After discussions with Ms. Tyler, investigators began to suspect that she had poisoned her husband. She subsequently gave a statement in which she admitted that on the night of his death she had scraped some of the powder from a drawer and put it in her husband's chili because she was afraid he would hurt her son.[1] She was subsequently indicted for murder. At trial, Ms. Tyler was represented primarily by appointed counsel, Richard A. Bishoff.[2] Mr. Bishoff had only been admitted to the bar several months before his appointment as petitioner's counsel in November of 1979.[3] He had never participated in a murder case and his sole criminal experience consisted of trying a robbery case and an aggravated assault case, each of which took less than half a day. Mr. Bishoff filed several pretrial motions including a motion to suppress Ms. Tyler's statement, a mo-

tion for a change of venue due to pretrial publicity, and a motion for a psychiatric examination. All of these were denied by the trial judge. At trial, Bishoff presented two witnesses for the defense: Shirley Tyler and her oldest son Tony, who was then thirteen. Ms. Tyler testified at trial that her husband had been depressed and that he committed suicide after she had refused to give him poison. The state offered two explanations of Ms. Tyler's motive for killing her husband. One theory was that she killed him in order to receive life insurance benefits. The second theory was that she was having an extramarital affair.[4] The jury convicted Ms. Tyler of first-degree murder. No evidence was introduced by either party at the sentencing phase of the trial. The jury imposed the death penalty and more specifically found the presence of the aggravating circumstance that Mr. Tyler's death was "inhuman in that it involved torture." O.C.G.A. § 17–10–30(7).

On direct appeal to the Georgia Supreme Court, petitioner's conviction and sentence were affirmed. *Tyler v. State,* 247 Ga. 119, 274 S.E.2d 549 (1981). The Supreme Court denied Ms. Tyler's petition for a writ of certiorari. *Tyler v. Georgia,* 454 U.S. 882, 102 S.Ct. 364, 70 L.Ed.2d 191 (1981). Petitioner exhausted the state collateral remedies and filed the instant petition in January of 1982. Two evidentiary hearings were held, one in September of 1982 and the second hearing in November of 1982. The magistrate issued his report and

---

1. Mr. Tyler had been hospitalized on two previous occasions for severe abdominal pain, nausea, uncontrolled bowels, and extreme thirst. Because the cause of these previous illnesses was never determined by a physician, the state's theory at trial was that the two previous illnesses were induced by Mrs. Tyler's poisoning of her husband as well.

2. Ms. Tyler was actually represented by two court appointed attorneys, Bishoff and Eric D. Hearn, Mr. Bishoff's law partner. Mr. Hearn assisted in trial preparation, Mr. Bishoff actually tried the case.

3. Mr. Bishoff had graduated from the University of Georgia Law School in March of 1979, taken the bar in February of 1979 and been admitted to the bar in June of 1979.

4. The district court found that there was little substantial evidence to support either of these theories. As to the insurance benefits claim, there was some evidence she inquired as to Mr. Tyler's insurance *after* his death. The jury, however, did not find that Ms. Tyler killed James Tyler for pecuniary gain even though the state urged them to do so at the penalty phase. *See* O.C.G.A. § 17–10–30(4) (aggravating circumstance; murder for the purpose of receiving money). The evidence regarding the extramarital affair centered upon a certain man Ms. Tyler had seen during a period of separation from her husband and who she was seen with after her husband's funeral.

recommendation finding no merit in any of petitioner's claims. Petitioner objected to the report and the district court subsequently granted habeas corpus relief as to the sentence of death.

There are five issues on appeal in this case; three of which are appealed by the state and two of which are raised on cross-appeal by Ms. Tyler. The state raises the following issues: (1) whether the district court erred in finding that Ms. Tyler was denied effective assistance of counsel in the sentencing phase of the trial because counsel presented no evidence in mitigation; (2) whether the trial court's charge on mitigating circumstances was constitutionally defective; and (3) whether certain comments made by the district attorney during closing argument were so prejudicial as to render the trial fundamentally unfair. The issues on cross-appeal are: (1) whether the death sentence is cruel and unusual punishment for a case involving a domestic homicide; and (2) whether Ms. Tyler was denied due process and equal protection of the law when the court denied her motion for a psychiatric examination both prior to trial and prior to the sentencing hearing. We approach these issues in turn.

*Ineffective Assistance of Counsel*

The district court found that Bishoff rendered ineffective assistance of counsel at the sentencing phase, principally because he presented no evidence of mitigating circumstances. Resolution of this issue requires application of the facts to the legal principles enunciated by the Supreme Court in the recent decision of *Strickland v. Washington,* — U.S. —, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In *Strickland,* the Court held that ineffective assistance of counsel would be measured by the test of whether counsel's conduct so undermined the proper functioning of the adversary process that the trial cannot be relied upon as having produced a just result. 104 S.Ct. at 2064. In order to make this determination, the Court delineated a two-part inquiry. First, did counsel in fact render a deficient performance? And second, if counsel's performance was deficient, was

this prejudicial to the defense in any particular way?

■ In order to make the first determination, the Court said that the test must be whether counsel's conduct fell below an objective standard of reasonableness. 104 S.Ct. at 2065. In other words, someone challenging the assistance of counsel must show that the particular acts of counsel were outside the "wide range of competent assistance." The Court also expressed a presumption in favor of competence that one challenging the effectiveness of counsel must overcome. 104 S.Ct. at 2066.

In order to make the second determination, it must be shown that the acts of counsel that were outside the range of competence were actually prejudicial, *i.e.,* that they had an adverse effect. 104 S.Ct. at 2067. In order to show actual prejudice, it must be shown that there was a "reasonable probability that but for counsel's unprofessional errors the result of the proceeding would have been different." 104 S.Ct. at 2068.

■ Applying these principles, we conclude that the district court did not err in holding that Bishoff was ineffective for failure to present mitigating evidence at the sentencing phase, and we conclude also that the omission was actually prejudicial.

During his investigation Bishoff (possibly accompanied by Hearn) met with members of Ms. Tyler's family at the jail for a couple of hours and discussed the case and defendant's background. Before trial Bishoff talked by phone with Shirley Tyler's grandmother and asked for the names of people who could testify. Immediately before trial, at the courthouse, Bishoff talked with the grandmother, aunt and brother. All stated, either at the jail or at the courthouse, or on both occasions, that they would not testify, or that they did not want to be involved. Their explanation, given at that time or at the habeas hearing, or both, was that they knew nothing of the murder and had nothing to tell.

The aunt and the grandmother testified that Bishoff did not tell them that their

testimony was needed on any subject other than guilt or innocence and did not explain the sentencing phase of the trial or that evidence of a mitigating nature was needed. They testified that they would have been willing to appear as mitigating evidence witnesses had they understood that such testimony was useful and needed, and they described various mitigating facts they could have covered in testimony. Bishoff's own testimony reveals that at no time did he discuss with the family members the need for their testimony in mitigation. Rather, so far as the family members knew from him, once they declined to testify because they knew nothing about the killing, the matter of their testifying ended. There was mitigating evidence that could have been submitted: that Shirley Tyler had no prior criminal record, not even an arrest; that she had a good work record and used her earnings to help care for her family; that her husband was drunk and abusive at times and had knocked out some of her teeth when drunk; that she and her children moved away at one time because he drank and beat her; that on one occasion he put her out of the house in her night clothes; that she was a good mother, "crazy about her children," and kept them clean and cared for; that her character and reputation as wife and mother were good.

Mitigating evidence from outside the family was possibly available. Despite testimony that Ms. Tyler had a good work record, no effort was made to bring forward testimony from her last employer. The absence of a prior criminal record was not adduced by evidence or stipulation.

Mitigating evidence was especially important because of the attitude in the small rural county where the murder occurred. Ms. Tyler's family lived outside the county. She had married and moved there. Her husband's family lived in the county. Both families were blacks, and the black community was outraged over the killing. Bishoff sought testimony from persons within the county but had difficulty finding anyone who would even talk to him about the case. He sought the testimony of a black minister, whose testimony he thought would be more helpful than that of anyone else, but to no avail. In these circumstances the testimony of family members, of defendant's former employer, and of her lack of a criminal record was especially important. These appeared to be the sole available sources for mitigating evidence, and they were not utilized.

As the Supreme Court has noted in its capital decisions, one of the key aspects of the penalty trial is that the sentence be individualized, i.e., the jury's discretion should be focused on the particularized nature of the crime and the characteristics of the individual defendant. *Gregg v. Georgia*, 428 U.S. 153, 206, 96 S.Ct. 2909, 2940, 49 L.Ed.2d 859 (1976). In *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) the court held that a defendant has the right to introduce virtually any evidence in mitigation at the penalty phase. The evolution of the nature of the penalty phase of a capital trial indicates the importance of the jury receiving adequate and accurate information regarding the defendant. Without that information, a jury cannot make the life/death decision in a rational and individualized manner. Here the jury was given no information to aid them in the penalty phase. The death penalty that resulted in this case was thus robbed of the reliability essential to assure confidence in that decision.

In a recent decision, *King v. Strickland*, 748 F.2d 1462 (11th Cir.1984), a panel of our circuit reached the same conclusion as we do on similar facts. In *King*, counsel, who had never tried a capital case, failed to present available character testimony in mitigation at the penalty phase. The panel concluded that this, in conjunction with his weak closing argument at the penalty phase, denied the petitioner effective assistance of counsel. As the court in *King* stated, "[t]here is a sufficient probability that effective counsel could have convinced a sentencer that the death sentence should not be given to undermine confidence in the outcome." at 1465.

We conclude that if evidence such as we have described had been offered at the penalty phase, there is a reasonable probability that the result of the proceeding would have been different, i.e., that a sentence of life as opposed to death would have been rendered by the jury. Therefore, we affirm the district court on the issue of ineffective counsel at sentencing.

In affirming we cannot agree with several other findings entered by the district court. The court found that Bishoff never attempted to contact family members except for defendant's brother and that in fact he never did contact family members. As appears from evidence set out above, these findings are plainly erroneous. The court found that Bishoff was "patently unreasonable in not presenting mitigating evidence because of his presumption that a jury with Christian women on it would not vote for the death penalty." Bishoff's statement was: "I knew a majority of those women and children, families, and most of them were of the Christian faith. I did not see how they would bring back a death penalty." This single remark by Bishoff is extracted from a considerable discussion by him of the efforts that he and Hearn had made to know about the jury and of his views concerning the jury. He explained that he knew most of the jurors in the small county. He testified that he and Hearn investigated potential jurors and had another lawyer go over the jury list as well. Clearly Bishoff relied on much more than a theory, that the district court viewed as implausible, that a jury with Christian women would not return the death penalty. The implication, or finding, that he rested on this alone is not supported by the record.

The district court was highly critical of Bishoff's brief closing argument. Except for the absence of mitigating evidence to comment upon, we find it hard to fault him for either brevity or content of the argument. His brief plea for mercy, plus an argument that Ms. Tyler had learned of her husband's insurance policy only after his death, was not wide of the mark.

The court found that Bishoff was confused about the distinction between the guilt and sentencing phases of the proceedings. We can find no evidence to support this conclusion.

Bishoff had been admitted to the practice of law for about six months and possessed limited trial experience. Based on these two facts alone, the court expressed "serious doubt" that Bishoff was in a position to make a sound judgment call about presentation of mitigating evidence. No court should appoint an inexperienced lawyer to represent the defendant in a death penalty case. The risks to defendant, counsel, the judicial system and the community at large are too great. But the test is performance, not time at the bar.[5]

### The Jury Charge Regarding Mitigating Circumstances

The district court found that the charge given to the jury on mitigating circumstances was constitutionally inadequate concluding that it failed to define mitigating circumstances or to describe their nature and function as required by this circuit's holding in *Spivey v. Zant,* 661 F.2d 464 (5th Cir. Unit B 1981). The particular instruction given to the jury in this case reads as follows:

> The law provides that the jury shall, before determining the punishment to be imposed, consider evidence in extenua-

---

5. Both appointed lawyers in this case worked on investigation. They talked with each other about what they achieved. Bishoff was lead counsel at trial and conducted most of the trial on behalf of defendant. We need not decide the extent to which in these circumstances trial counsel may be held ineffective if there are failures in seeking out evidence, for it is clear in this case that Bishoff talked to family members about their testifying and did not seek mitigat-

ing testimony from them, and that he knew that Ms. Tyler had a good work record and had been in no criminal difficulty. We do not imply that co-counsel Hearn failed in any respect. We merely note that the district court appeared to proceed on an unspoken premise that if there were shortcomings in investigation, preparation, or trial, all were chargeable to Bishoff. This is an issue for another day.

tion, mitigation, and aggravation of punishment, all authorized by the law, and in addition it shall consider any statutory aggravating circumstances which may be supported by the evidence. And the only issue at this time is the determination of the punishment to be imposed. Now in addition to the aggravating circumstances presented by the state, I specifically charge you that the law provides that you are to consider mitigating circumstances where there are mitigating circumstances, authorized by the law and warranted by the evidence in arriving at your decision on the appropriate penalty to be imposed. You may consider any matter in this case contended for by the defendant as a mitigating circumstance even though the defendant does not specifically enumerate any particular matter as a mitigating circumstance. Anything about the case that you consider might go in mitigation, you should consider it, and I specifically direct you to do so.

■ In reviewing the adequacy of a jury charge we look to the charge in its entirety. *Cupp v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973). This standard applies to the sentencing as well as the guilt innocence phase of a trial. *Westbrook v. Zant,* 704 F.2d 1487, 1501 (11th Cir.1983). Therefore, an appellate court must decide whether the charge given, viewed in the context of the entire instruction, failed to adequately guide the jury with respect to the nature and function of mitigating circumstances. *Morgan v. Zant,* 743 F.2d 775 (11th Cir. 1984). In *Spivey, supra,* the court said that there must be a clear instruction on mitigation that guides and focuses the jury's objective consideration of the particularized circumstances of the individual offense. 661 F.2d at 471. An instruction regarding mitigating circumstances must normally explain both what a mitigating circumstance is as well as its function in a capital sentencing determination. *Id.* Although the instruction does not specifically have to mention the word "mitigating," it must communicate that the law considers circumstances which reduce punishment

and the degree of moral culpability. As this circuit has repeatedly stated:

> An authorization to consider mitigating circumstances is a hollow instruction when unaccompanied by an explanation informing the jury why the law allows such a consideration and what effect a finding of mitigating circumstances has on the ultimate recommendation of sentence.

*Finney v. Zant,* 709 F.2d 643, 647 (11th Cir.1983) (quoting *Westbrook* ).

■ While we conclude that the instruction failed to communicate clearly the weight and consideration the jury should give to mitigating evidence, we cannot say this affected the outcome of the trial. We have already discussed the fact that the jury heard no mitigating evidence because of the ineffectiveness of counsel. Thus, it is unnecessary to rule squarely upon whether the instruction was error, since we reverse because of the absence of mitigating evidence.

*Prosecutorial Misconduct*

Appellee argued in the district court that certain remarks made by the prosecutor during closing argument in the sentencing phase of her trial were prejudicial.

The district court did not determine whether the prosecutor's statements required relief in this case as it had already decided to grant the writ on two other grounds. Likewise, as we have affirmed the district court on the grounds of ineffective assistance of counsel, we also do not reach the merits on this issue.

*The Death Penalty as Cruel and Unusual Punishment for a Domestic Homicide*

■ The appellee argues, in essence, that it is cruel and unusual punishment in violation of the Eighth Amendment to impose the death penalty in a domestic homicide case. Appellee relies upon the Supreme Court case of *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). This claim is without merit as *Godfrey* does not stand for a blanket proposition that the death penalty constitutes cru-

el and unusual punishment when imposed for a domestic homicide.

### Denial of a Psychiatric Examination

■ Defense counsel in this case twice petitioned for a psychiatric examination for the appellee. Prior to trial, counsel filed a motion for psychiatric examination for the purpose of determining appellee's competence to stand trial and appellee's sanity at the time of the offense. The trial judge denied the motion. Counsel later requested a psychiatric examination prior to the penalty phase of the trial in response to the trial court's inquiry regarding the presentation of mitigating evidence. Again, the trial court denied the motion. This second request was made upon trial counsel's belief that his client did not have the mental capacity to understand what she had done or what happened at trial and the fact that he had been unable to effectively communicate with her. However, at no point was there ever a special pleading of insanity. Under Georgia law, without a special plea of insanity, it is within the trial court's discretion to grant or deny a motion for a psychiatric examination. *Cobb v. State,* 244 Ga. 344, 260 S.E.2d 60 (1979). Appellee's contention is essentially that a psychiatric examination would have developed mitigating evidence regarding her mental state and would have been especially useful in the penalty phase of the trial.

■ The law of this circuit controlling this issue is *Westbrook v. Zant,* 704 F.2d 1487 (11th Cir.1983). In *Westbrook,* the court concluded that the state is required to furnish the services of a psychologist or psychiatrist only in those capital cases deemed appropriate by the state trial court. As we noted above, in the absence of a special plea of insanity which was not filed here, a request for a psychiatric examination is a matter of trial court discretion in Georgia. The panel in *Westbrook,* concluded there had been no abuse of discretion because the evidence which Westbrook sought could have been demonstrated by other methods such as testimony of friends, relatives, neighbors, or the defend-

ant's own testimony. In this case, the district court concluded that similar evidence could have been presented in Ms. Tyler's case, although trial counsel did not attempt to do so. We are in agreement with the district court.

Because of the amorphous nature of counsel's request for a psychiatric examination as well as the fact that the court in *Westbrook* refused to grant relief based upon a denial of a psychiatric examination under a fact situation more compelling than this, we affirm the district court on this issue.

Therefore, the judgment of the district court is

AFFIRMED.