A93A0118. CLAY v. THE STATE.
(433 SE2d 377)

ANDREWS, Judge.

Clay was convicted of armed robbery, aggravated sodomy, aggravated assault, false imprisonment, and possession of a knife during the commission of a crime. He appeals.

Viewed in favor of the verdict, the evidence was that on November 29, 1989, the victim, at the time 19 years of age, took her 14-month-old daughter to a laundromat for the purpose of doing laundry. Upon her arrival at the laundromat, she was assisted by Clay, who helped her carry in the large box of clothes. She had never met Clay prior to this and had only recently arrived in Gwinnett County. Having arrived around 4:00 p.m., the victim completed her laundry around 5:00 p.m. At that time there was no one in the laundromat except the victim, Clay and the baby. Clay grabbed her, rammed her head into a dryer, pulled a knife and forced her to remove her clothing. When she did not do this quickly enough, Clay ripped her blouse, ripped her bra off, and fondled her breasts.

Clay then told her to turn around and when she refused, he slapped her across the face. Additionally, Clay grabbed her from behind, put the knife to her throat and said "admit you're a slut." At that point Clay told her that if he committed an act of oral sodomy upon her, he would let her go. Additionally, Clay told her that if she did not do what he wanted, he would kill her and the baby. Having completed the act of oral sodomy, Clay forced her to lie down on the floor and kicked her twice in the vaginal area. Clay then demanded her money, which she turned over to him. At all times during these events, the victim could see the knife. Also, periodically during the

encounter, Clay would run to the front of the laundromat, look out the window, and make sure that no one was in the area. Clay advised her to remain still and count to a certain number as he left the scene.

The victim ran to a store in the area, called police, and gave a description to officers. She said that the attacker was wearing blue pants, a shirt, a jacket, and a hat containing the word "woman" in a phrase. She further described him as having gray or black hair, a full beard, glasses and being about 40 years of age. Approximately five minutes after the attack, police took her to view a male in the area. Initially, from approximately 30 feet away, she indicated that he was the man. Upon getting closer, however, she stated that he was not. Shortly thereafter, police took her to see Clay, found about a half-mile from the laundromat. She did not hesitate in identifying Clay as her attacker. Clay was known to the officers since he frequented a local store and lunch counter where the officers ate. Because the description given by the victim fit Clay, Sergeant Eberhardt conducted the showup within 30 to 40 minutes after the assault. Because the sergeant was in an unmarked car not containing an enclosure for transporting prisoners, he requested a uniform unit. Officer Tinkey arrived and took custody of Clay. Clay consented to the search of his trailer and was transported there by Officer Tinkey. Sergeant Eberhardt and a lieutenant conducted the search, finding a dark blue hat bearing the following slogan, "I like my whiskey on ice, my women on fire." Cash was found on the person of Clay as well as a pocketknife containing a blade "a fraction over three inches." At the time of his arrest, Clay was wearing a different hat.

After the search, Officer Tinkey was directed to transport Clay to the station. At that point, Tinkey advised Clay concerning his *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966), rights. On the way to the station, Clay initiated conversation with Officer Tinkey, asking if he knew how to get in touch with Picosnic, a former police officer who had become a psychologist. Tinkey replied that he would help Clay out however he could. Tinkey testified that his reference was to getting Clay in touch with Picosnic and was not meant to indicate anything else. Officer Tinkey also acknowledged that he had included in his report on the incident his use of the following statement: "If you will shoot straight, I will try to help you out." Clay then asked what kind of help the officer could provide. Clay told the officer that he had been to prison and did not want to go back. In response to this question, Officer Tinkey said that he could not make any promises, but that it was in Clay's best interest to tell the truth. At this juncture, Clay asked to speak with Sergeant Eberhardt. Upon arriving at the station, Officer Tinkey advised Sergeant Eberhardt that if he would speak to Clay, Clay would admit what he had done. Because of required paper work, it was two to two-

and-one-half hours after he arrived at the station before Sergeant Eberhardt ever spoke with him. Before interviewing Clay, Sergeant Eberhardt advised him again of his rights under *Miranda*. In addition to orally advising Clay, Sergeant Eberhardt provided him with a written advice of rights which Clay read. Clay initialed each specific right of which he was advised and signed the form. An interview was then conducted of Clay and videotaped. It lasted approximately 30 minutes. Although initially Clay repeatedly stated that he did not know or did not remember what had happened, he eventually acknowledged all of the acts set out above, except he did not acknowledge threatening the baby.

1. In his first enumeration Clay contends that the admission of his statement was improper because it was given after being induced by the hope of benefit. OCGA § 24-3-50.

Clay did not testify at the *Jackson v. Denno* hearing nor at the trial.[1] Although the cases relied upon by Clay, including *State v. Barber*, 197 Ga. App. 353 (398 SE2d 419) (1990), deal with individuals of limited intelligence and the argument made below was that Clay was limited, there was no evidence presented in support of that contention. In fact, at the trial, a psychologist who had tested Clay gave the opinion that he was of basically normal intelligence although he tended to have odd or peculiar thought processes. Therefore, this contention of Clay is not supported by the record.

"For an officer to advise an accused that it is always best to tell the truth will not, without more, render a subsequent confession inadmissible under [OCGA § 24-3-50]." *Tyler v. State*, 247 Ga. 119, 122 (2) (274 SE2d 549) (1981). Likewise, the statement that "we're here for you," is not such a "hope of benefit," as prohibited by that Code section. *Kettman v. State*, 257 Ga. 603, 607 (10) (362 SE2d 342) (1987).

Officer Tinkey's offer to assist Clay in finding the psychologist likewise does not constitute the hope of benefit prohibited by the statute. *Head v. State*, 180 Ga. App. 901, 902 (1) (350 SE2d 854) (1986); see *Newsome v. State*, 189 Ga. App. 329, 331 (2) (375 SE2d 621) (1988).

"When a trial judge has made a determination as to the voluntariness of a confession after a suppression hearing, such determination must be accepted by the appellate courts unless his decision is clearly erroneous." *Gibbs v. State*, 235 Ga. 480, 483 (3) (220 SE2d 254) (1975). Likewise, factual determinations and credibility relating to the admissibility of a confession will be upheld on appeal unless clearly erroneous. *Barber*, supra at 354. There was no error.

---

[1] *Jackson v. Denno*, 378 U. S. 368 (84 SC 1774, 12 LE2d 908) (1964).

2. In his third enumeration, Clay contends he was denied a fair trial due to improper closing remarks by the prosecutor. While the record contains the objection made to the closing argument, the closing argument is not contained in the record. "Error must be shown affirmatively by the record, and not by mere recitations in a brief. [Cits.]" *Standridge v. State*, 196 Ga. App. 697, 698 (3) (396 SE2d 804) (1990). Having failed to so support his claim, nothing has been presented for our review.

3. The remaining two errors, numbers 2 and 4, deal with the issue of merger of offenses and will be addressed together.

Clay argues that the offenses of aggravated assault and armed robbery merged as a matter of fact. OCGA § 16-1-6 (a). The indictment alleges that the armed robbery occurred "by use of an offensive weapon . . . a knife," while the aggravated assault count alleges that Clay made an assault upon the person of the victim "with a knife, a deadly weapon, by holding said weapon to the throat of said victim." As reflected in the statement of facts above, the use of the knife was not only aimed at obtaining money from the victim, but also at intimidating and threatening her with regard to the other acts committed. Here, as in *Bales v. State*, 200 Ga. App. 97 (406 SE2d 790) (1991), the victim testified to several different, although sequential, acts performed by Clay against her person. There was no merger.[2]

"Likewise, the offense of possession of a firearm during the commission of a felony does not merge into the accompanying felony, i.e., armed robbery [and aggravated assault] so that the defendant can be convicted of both without statutory or constitutional prohibition. *Wiley v. State*, 250 Ga. 343, 351 (6) (296 SE2d 714) (1982)." *Brown v. State*, 199 Ga. App. 773, 774 (406 SE2d 248) (1991).

*Judgment affirmed. Pope, C. J., and Birdsong, P. J., concur.*

DECIDED JUNE 28, 1993.

*Ronnie K. Batchelor*, for appellant.

*Thomas C. Lawler III, District Attorney, George F. Hutchinson III, Assistant District Attorney*, for appellee.

---

[2] Compare *Smith v. State*, 193 Ga. App. 208, 209 (1) (387 SE2d 419) (1989) in which the only use of the offensive weapon was during the obtaining of the funds, thereby factually merging any aggravated assault with the robbery.